Rockingham
No. 88-493

THE STATE OF NEW HAMPSHIRE

v.

CECIL C. HUNTER

December 28, 1989

*John P. Arnold*, attorney general (*Tina Schneider*, assistant attorney general, on the brief), by brief for the State.

*James E. Duggan*, chief appellate defender, of Concord, by brief for the defendant.

BROCK, C.J.   The defendant, Cecil Hunter, was convicted after a jury trial in Superior Court (*Contas*, J.) of aggravated felonious sexual assault, RSA 632-A:2, I. On appeal, the defendant argues that: (1) the State failed to provide sufficient evidence to prove the victim's lack of consent, and (2) the trial court erred in failing to grant a mistrial based upon references to uncharged criminal conduct made during the prosecutor's opening statement and during the testimony of a witness. We affirm.

The female victim first met the defendant on July 30, 1987, at the Collind residence in South Berwick, Maine, where she had gone to do house cleaning. At this initial encounter, she engaged in conversation with John Collind and his companion, the defendant,

while waiting for the two men to depart so that she could clean the living room. After waiting approximately half an hour, she left the house with a friend who had come to meet her.

Later that same day, while the victim was sitting on the doorstep of her apartment building, the defendant rode up on a bicycle. He attempted to convince the victim to accompany him to the beach. When his overtures were met with refusals, he rode away. The defendant appeared at the victim's apartment on at least one other occasion during the next few days. The victim was irritated by the defendant's persistence and instructed her son, if the defendant should come by the apartment again, not to offer him any information. She did this because she "didn't have very goods (sic) feelings about this person."

On the evening of August 3, 1987, the victim was again sitting on her doorstep, drinking a beer and conversing with a teenage neighborhood boy. At about 11:00 or 11:30, the defendant pulled up in a car and said he "wanted to talk." The victim accepted the defendant's invitation to join him in the parked car, but warned, "Don't you even think about taking off anywhere with me in this car." She also asked the neighborhood boy, who was sitting on his bicycle outside the passenger side of the defendant's vehicle, not to leave.

The three listened to a comedy tape until the defendant became hostile toward the teenager. He chased the boy around the car, demanded that he leave, and displayed what the boy believed to be the butt-end of a hand pistol. At that point, the neighborhood boy departed.

The defendant then jumped into the car and proceeded to drive. The victim asked him where he was going. He first responded by telling her that they were going to the beach and then later told her they were going "for a little ride." The victim said "Well, it better be damn little, five to ten minutes, and I want to be home." As they drove, the defendant laughed hysterically at the comedy tape and then displayed extreme outbursts of anger, telling the victim, "You make me sick." The victim testified that she had "never seen mood swings that drastic and that quick."

After approximately thirty minutes, the defendant stopped at a Portsmouth convenience store. The defendant said "he had to see somebody in the store . . . [b]ecause they were going to kill him." While the defendant was in the store the victim "didn't know what to do." She testified that she was "quite nervous at the time because of the mood swings" and that she "didn't know if [she] got out of the car and started to run if he was going to come after [her]."

The defendant returned to the car and drove to an apartment complex. The defendant said he "had to stop" at his sister's apartment "for a few minutes." The victim went into the apartment with the defendant, believing it to be occupied. The defendant then said he had "to go out for a few minutes." He grabbed a small bag and left the apartment. He told the victim to sit down, watch television and not open the door for anybody.

After the defendant left the apartment, the victim sat on the couch for a few minutes and then went to the rear door and tried "to figure out how to unlock [the] door because [she] was considering just leaving." At that point, she heard the defendant opening the front door and she went back to the couch.

Upon his return, the defendant approached the victim and tried to get her to stand up by tugging on her hand. His efforts were met with rejection. When she did stand up, he attempted to kiss her. The victim responded by stating that she did not want any type of sexual relationship with the defendant. The defendant became extremely angry, he picked up the victim, carried her into the bedroom and placed her on the bed.

In the bedroom, the defendant attempted to undo the victim's slacks. She put her hands over her belt buckle, and repeatedly said, "No, don't do this. I don't want to do this." He kept removing her hands until finally the victim gave up. The defendant removed the victim's slacks and, after meeting comparable resistance, also removed the victim's shirt. The victim testified that she was thinking of her four children at the time. She said that she was "getting quite angry ... but [she] was too afraid to voice it." She was afraid of "being beaten or killed" and "didn't know what could have happened."

After the defendant had removed the victim's clothing, she continued to resist by keeping her knees together. The defendant eventually prevailed in his efforts when, as the victim testified, "he finally got my legs open, and got on top of me." The defendant held the victim down while he engaged in sexual intercourse.

Following this incident, the defendant drove the victim back to South Berwick. They arrived at the victim's apartment at approximately 3:00 a.m. The incident was reported to the authorities the following day.

On August 12, 1987, Cecil Hunter was arrested and charged with aggravated felonious sexual assault. At trial, the defendant testified that the victim consented to have sexual intercourse with him that night. The jury found the defendant guilty, and he was sentenced to three to six years in the State Prison.

The first claim raised by the defendant on appeal is that the State failed to submit sufficient evidence to prove lack of consent beyond a reasonable doubt. The defendant asserts that the victim could not reasonably have believed that she was in danger of serious bodily injury and that the amount of resistance was insufficient under the circumstances. He argues that, without evidence of greater resistance on the part of the victim, the State failed to prove lack of consent and, therefore, that the trial court erred in not dismissing the charge.

To obtain a conviction for aggravated felonious sexual assault, the State has an affirmative obligation to prove beyond a reasonable doubt that the victim did not consent. *State v. Preston*, 121 N.H. 147, 149, 427 A.2d 32, 33 (1981). The defendant would have the trial court determine whether consent was withheld by evaluating the relationship between the level of resistance offered by the victim and the victim's reasonable belief that such resistance will lead to serious injury. Using this so-called principle of proportionality, the defendant asserts that the victim's resistance did not rise to a level adequate to demonstrate lack of consent, because she could not reasonably have believed that she was in danger of serious bodily injury.

We decline to adopt the defendant's formula and find his argument deficient for two reasons. First, while the type and amount of resistance may be considered in determining lack of consent, it is not dispositive in all circumstances. "Lack of consent may be proved in a variety of ways, including but not limited to an attempt to escape, outcry, or offer of resistance, except where the complaining witness is restrained by fear of violence." *State v. Lemire*, 115 N.H. 526, 532, 345 A.2d 906, 911 (1975). When, as in this case, the victim clearly states that she does not want to participate in sexual intercourse, she repeatedly rejects sexual overtures, she is physically forced to submit, and she is held down by the defendant during sexual penetration, the trial court need not then measure the degree of her resistance in order to decide whether the defendant had her consent.

Second, the evidence does not support the defendant's claim that the victim could not reasonably have believed that she was in fear of serious bodily injury. The victim observed the defendant's drastic mood swings, she heard him speak about his involvement with people who might kill him, she was picked up and carried into the bedroom against her will and she was physically and forcibly thwarted in her efforts to stop the defendant from sexually assaulting her.

In determining the sufficiency of evidence, we view the evidence in the light most favorable to the State, with all reasonable inferences drawn therefrom. *State v. Stauff*, 126 N.H. 186, 189, 489 A.2d 140, 142 (1985). The defendant bears the burden of showing that no rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Amell*, 131 N.H. 309, 311, 553 A.2d 286, 288 (1988). After reviewing the record, we hold that the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that the victim did not consent to sexual penetration by the defendant.

The defendant bases his second claim on two references to uncharged and irrelevant criminal conduct made during his trial. The first reference occurred during the opening statement, when the prosecutor described an offer of marijuana made by the defendant to the victim. The second reference was made during the direct examination of the victim, when she testified that the defendant had solicited another person to engage in insurance fraud. After both of these statements and at the close of the State's case, the defendant objected and moved for mistrial. The defendant now claims that the trial court erred in denying his motions. He argues that, absent curative instructions, the jurors were free to speculate on the extent of the defendant's other criminal activities and to use such speculation in determining his guilt on the single charge before them.

"The standard of review of the denial of a motion for a mistrial is whether the trial court abused its discretion." *State v. Lemire*, 130 N.H. 552, 554, 543 A.2d 425, 426 (1988). To justify a mistrial, prejudicial testimony must be more than inadmissible, it "must constitute an irreparable injustice that cannot be cured by jury instructions." *Id.* at 555, 543 A.2d at 426. The prejudicial impact of testimony can best be gauged by the trial judge, and a mistrial need not be granted when instructions to the jury can cure the prejudicial effect. *Id.*, 543 A.2d at 426–27. We presume that curative instructions are followed by the jury. *Id.*

A review of the record reveals that, although defense counsel moved for mistrial, he did not request that curative instructions be given to the jury. It is the obligation of counsel to request instructions limiting the scope of evidence. *State v. Bruce*, 132 N.H. 465, 470, 566 A.2d 1144, 1148 (1989). Although the trial court must provide limiting instructions when prior convictions of the defendant are introduced into evidence to impeach his credibility,

562

no such obligation exists, absent a request from counsel, when uncharged criminal acts are disclosed to the jury. *Id.*

██ If the trial judge believed that the prejudice created by the remarks regarding the defendant's uncharged criminal conduct could be corrected by curative instructions, then he was correct in not declaring a mistrial. It was the obligation of the defendant to request curative instructions, and his failure to do so does not justify a reversal of his conviction. Error cannot be ascribed to the trial court's failure to give such instructions, because the trial court could have reasonably concluded that, as a matter of trial tactics, the defendant did not want to emphasize further his other bad acts. *See State v. Bruce, supra* at 470, 566 A.2d at 1148. The trial court did not err in denying the defendant's motions for mistrial.

In conclusion, we hold that the evidence was sufficient for the trial court to find beyond a reasonable doubt that the defendant lacked the consent of the victim at the time he assaulted her, and we also hold that the trial court did not abuse its discretion when it denied the defendant's motions for mistrial.

*Affirmed.*

All concurred.