Hillsborough
No. 92-071

BORDER BROOK TERRACE CONDOMINIUM ASSOCIATION AND
EDWARD STARR

v.

SUMNER GLADSTONE *& a.*

March 30, 1993

*Hamblett & Kerrigan P.A.*, of Nashua (*Timothy G. Kerrigan* on the brief and orally), for Border Brook Terrace Condominium Association.

*Edward Starr, pro se,* filed no brief.

*Upton, Sanders & Smith,* of Concord (*Russell F. Hilliard* and *Gilbert Upton* on the brief, and *Mr. Hilliard* orally), for the defendants.

JOHNSON, J. The defendants, Sumner Gladstone, Babson-Reed Corporation (Babson-Reed), and Mt. Vernon Realty Trust (Mt. Vernon), appeal from a Superior Court (*Hampsey,* J.) jury verdict awarding damages to the plaintiffs, Border Brook Terrace Condominium Association (the Association) and Edward Starr, a representative of a class of individual condominium unit owners. The plaintiffs had sued the defendants for negligence, misrepresentation, and breach of implied and express warranties because of defects in the Border Brook condominium development allegedly caused by the defendants. The defendants raise many issues on appeal, including whether the Association had standing to sue and whether the trial court should have declared a mistrial because of remarks made by the plaintiffs' counsel during his closing argument. We hold that the

Association had standing to sue, but find that the plaintiffs' counsel's closing argument contained allegations of facts not in evidence, assertions of the counsel's personal belief, and accusations and insinuations of criminal conduct similar to conduct at issue in the trial. We hold these comments to be improper and incurably prejudicial to the defendants and, therefore, reverse and remand.

We address the standing issue first. Relying on RSA 356-B:15 and RSA 356-B:41, we find that the Association does have standing. RSA 356-B:15 states:

> "The declarant, every unit owner, and all those entitled to occupy a unit shall comply with all lawful provisions of this chapter and all provisions of the condominium instruments. Any lack of such compliance shall be grounds for an action or suit to recover sums due, for damages or injunctive relief, or for any other remedy available at law or in equity, maintainable by the unit owners' association, or by its board of directors or any managing agent on behalf of such association, or, in any proper case, by one or more aggrieved unit owners on their own behalf or as a class action."

RSA 356-B:41 states in pertinent part:

> "I. Except to the extent otherwise provided by the condominium instruments, all powers and responsibilities with regard to maintenance, repair, renovation, restoration, and replacement of the condominium shall belong (a) to the unit owners' association in the case of the common areas, and (b) to the individual unit owner in the case of any unit or any part thereof. . . .
>
> II. Notwithstanding anything in this section to the contrary, the declarant shall warrant or guarantee, against structural defects, each of the units for one year from the date each is conveyed, and all of the common areas for one year."

Paragraph II of RSA 356-B:41, together with RSA 356-B:15, plainly grants the Association the authority to maintain a suit for breach of express warranty against Mt. Vernon (the declarant) and, provided the Association can "pierce the corporate veil," against Sumner Gladstone. We read paragraph I of RSA 356-B:41 as granting the Association the authority to maintain the other portions of its suit against the defendants as well. As one component of the power to repair is the authority to seek payment from parties whose actions

compel the repair work, we think it logical to interpret the broad language of this statute as allowing an association to sue for defects in the common areas. *See* R. NATELSON, LAW OF PROPERTY OWNERS ASSOCIATIONS § 8.2.4, at 314–15 (1989) (criticizing decisions barring condominium associations for lack of standing from suing developers for defects in the common areas). Our position is buttressed by several other provisions of the condominium act relating to the powers and responsibilities of condominium associations, including RSA 356-B:35 (association for self-governance mandatory), RSA 356-B:40, III (officer of association is suitable person to receive service of process on association), RSA 356-B:42 (default grant of power in association to deal with common areas), RSA 356-B:43 (requiring association or its delegee to obtain master casualty and master liability insurance for condominium), and RSA 356-B:46 (creates lien for the benefit of the association for unpaid assessments, provides for suit to enforce lien, and implies that association may bring suit to recover assessments without lien procedure).

The defendants argue that RSA 356-B:41, I, applies only to defects in the condominiums arising after the Association came into existence and that, because the Association came into existence after the buildings were constructed, RSA 356-B:41, I, does not apply here. We disagree. RSA 356-B:41, I, says nothing about the timing of the defects or of the unit owners' association's creation, and instead describes the association's "powers and responsibilities with regard to maintenance, repair, renovation, restoration, and replacement" of the common areas without limitation. We will not create a qualification to the Association's authority that is not plainly mandated by the legislature.

We now turn to the question of the plaintiffs' counsel's closing argument. The facts necessary to resolve this issue are as follows. At all relevant times, Sumner Gladstone was a sixty percent stockholder of Babson-Reed, the corporation that built the Border Brook condominium development, as well as the trustee of Mt. Vernon, the condominium's declarant and seller. At trial, the plaintiffs introduced testimony of commingled funds and sham enterprises in an attempt to "pierce the corporate veil" and hold Gladstone personally liable. In particular, the plaintiffs argued that Gladstone funneled the profits of Babson-Reed and Mt. Vernon into his private accounts after he learned of the plaintiffs' potential claims against these organizations, thus protecting his own financial security at the expense of the plaintiffs' just claims.

The superior court addressed the plaintiffs' claim by instructing the jury on the doctrine of "piercing the corporate veil." The relevant portion of the instruction reads:

"This is a doctrine in New Hampshire which allows a plaintiff to pierce the corporate veil and thereby place liability on an individual. This may be done if a finding is made that the corporate entity or trust entity has been used in such a way as to promote an injustice or fraud upon a plaintiff making the claim.

In this regard, with respect to the issue of liability concerning Sumner Gladstone, you may consider the following factors:

Number one, whether an unfair and unjust result would occur, unless you disregard the formal existence of the trust or corporate entity.

Whether the trust or corporation was established or carried on without [sufficient] assets to meet its anticipated debts and obligations.

The intermingling of properties, accounts, records, employees, and business transactions by the trust or corporation.

Whether the trust or corporation substantially depleted its assets after being advised that defects existed in the condominium projects and claims were threatened or actually filed seeking damages."

The plaintiffs' counsel's closing argument, which immediately preceded the court's jury instructions, contained the following remarks.

"Mr. Gladstone is not here on criminal charges. We are not accusing him of any crimes, although some of the evidence may suggest to you that his conduct was less than law abiding. . . . And I'll also submit to you that I believe there was probably another association down in Florida that is having the profits from their project skimmed off at this time so that there will be no money available to them either when they find out the kind of problems they have on their project."

The defendants objected to these statements and asked for a mistrial. The court denied their request and instead gave a curative instruction, first reading a verbatim transcript of the offending excerpts to the jurors and then instructing them "to give those comments now stricken absolutely no consideration whatsoever in the course of your deliberations."

On appeal, the plaintiffs do not deny the impropriety of their counsel's remarks, but assert that the superior court's instruction cured any undue prejudice the statements may have caused the defendants. The defendants, on the other hand, maintain that, under the circumstances, a mistrial was the only suitable remedy. We agree.

Mistrial is an exceptional remedy. It is rarely used and ordinarily reserved for extraordinary situations.

> "The standard of review of the denial of a motion for a mistrial is whether the trial court abused its discretion. The basis for granting a mistrial is the existence of some circumstances which indicates that justice may not be done if the trial continues to verdict. The remarks or the conduct must be more than merely inadmissible; they must constitute an irreparable injustice that cannot be cured by jury instructions. Thus, even if prejudicial testimony was introduced against the defendant, the motion for mistrial may be denied because curative instructions are presumed to be followed."

*State v. Lemire*, 130 N.H. 552, 554–55, 543 A.2d 425, 426–27 (1988) (citations and quotation omitted).

Although deference is usually accorded to a trial court's determination in this area, *see id.*, the deference varies with the grounds for mistrial alleged, *cf. State v. Hartford*, 132 N.H. 580, 584, 567 A.2d 577, 580 (1989) (when trial court grants motion for mistrial, this court's scrutiny of the decision varies according to the reasons given; where jury appeared deadlocked, trial court's declaration of mistrial was readily affirmed). For example, we have upheld a trial judge's choice of curative instructions over a declaration of mistrial where the offending remarks were ambiguous, *see State v. Ellison*, 135 N.H. 1, 4, 599 A.2d 477, 480 (1991), where the complaining party appeared to have brought the problem on himself, *see Panas v. Harakis & K-Mart Corp.*, 129 N.H. 591, 614–15, 529 A.2d 976, 990 (1987), and where the incremental prejudicial effect of the remarks seemed to have been minimal, *see Blais v. Town of Goffstown*, 119 N.H. 613, 619–20, 406 A.2d 295, 299–300 (1979). On the other hand, we have reversed the denial of a motion for mistrial where counsel offered his or her personal opinion on a material issue, *see State v. Bujnowski*, 130 N.H. 1, 4, 532 A.2d 1385, 1387–88 (1987) (curative instructions held insufficient); *see also* N.H. R. PROF. CONDUCT 3.4(e), and where a witness alluded to criminal conduct of the defendant similar to the conduct charged, *see State v. Woodbury*, 124 N.H. 218, 221, 469 A.2d 1302, 1305 (1983) (curative instructions held insuf-

ficient); *State v. LaBranche*, 118 N.H. 176, 179, 385 A.2d 108, 110 (1978) (curative instructions, had they been given, would have been insufficient). Outside the mistrial context, we have also reversed a verdict where an attorney's closing statement included assertions of crucial facts not in evidence, *see State v. Lake*, 125 N.H. 820, 822–23, 485 A.2d 1048, 1051 (1984), although our decision depended in large part on the trial judge's failure to give curative instructions, *id.*

Here we have a closing statement that combines most of the elements found so abhorrent in *Bujnowski, Woodbury, LaBranche* and *Lake*. First, the plaintiffs' counsel asserted facts not in evidence by insinuating that Gladstone's conduct was criminal and that profits were being "skimmed" from a condominium project in Florida. *See Lake*, 125 N.H. at 822, 485 A.2d at 1050. Second, the attorney offered his opinion on a material issue by stating, "*I believe* there was probably another association down in Florida that is having the profits from their project skimmed off at this time so that there will be no money available to them either when they find out the kind of problems they have on their project." (Emphasis added.) As the allegation of similar behavior at the Border Brook condominium project was one of the main components of the plaintiffs' attempt to hold Gladstone personally liable, the assertion went directly to a material issue. *See Bujnowski supra.* Finally, the remarks of plaintiffs' counsel were likely interpreted by the jury as assertions of criminal conduct similar to the conduct alleged as grounds for "piercing the corporate veil." *See Woodbury*, 124 N.H. at 221, 469 A.2d at 1305; *LaBranche*, 118 N.H. at 179, 385 A.2d at 110. The phrase "having the profits from their project skimmed off" has a decidedly criminal ring to it; combined with the attorney's earlier allegation that "some of the evidence may suggest to you that his conduct was less than law abiding," the unfairly prejudicial effect is obvious.

■ The Association maintains that the trial judge's curative instructions were sufficient to remove the taint of their attorney's improper comments, and that therefore mistrial was not the proper remedy. *Cf. Lake*, 125 N.H. at 822–23, 485 A.2d at 1051 (where no curative instructions given, prosecutor's assertions of crucial facts not in evidence compelled a reversal). In the Association's favor, we note that this is not a criminal case, as were *Bujnowski, Woodbury,* and *LaBranche*, the mistrial cases described above; Gladstone's liberty is not at stake, and the plaintiffs' counsel's statement of personal belief might not have influenced the jury as much as a public prosecutor's opinion, *see Bujnowski*, 130 N.H. at 4, 532 A.2d at 1387. We think, however, that these factors are outweighed by the sheer

number of ways in which the offending statements were improper. Perhaps any one error, in isolation, would be insufficient to mandate a mistrial, but in conjunction we find them sufficient. Moreover, here the jury heard the plaintiffs' counsel's improper remarks not once, but twice. After the plaintiffs' counsel completed his closing argument, the trial court repeated the offensive portions to the jurors word-for-word before telling them to ignore what they had just heard. Even though the plaintiffs' counsel expressed regret at his remarks, we hold that under these circumstances no instruction could have sufficed to cure the irreparable injustice caused by the plaintiffs' counsel's remarks. A mistrial was required.

We do not intend here to hobble a trial court's discretion in the ordinary case to choose between giving the jury a curative instruction and simply continuing the trial, see LaBranche, 118 N.H. at 180, 385 A.2d at 110 (curative instruction may "serve[] only to emphasize the prejudice"); nor do we mean to imply that the bell may never be "unrung," see State v. Hunter, 132 N.H. 556, 561, 567 A.2d 564, 568 (1989) (court presumes that curative instructions are followed by jury). Instead, we merely hold that in the extraordinary case, such as this one, the bell is simply too loud to be successfully dampened.

For the sake of judicial economy, we now address those additional issues raised by the defendants that are likely to arise again on remand and do not appear to depend heavily on the particular evidence presented at the trial below. First, the defendants argue that the superior court erred in denying their motion to dismiss the negligence portion of the plaintiffs' action. The plaintiffs' negligence claim fails, the defendants argue, because it alleges purely "economic loss," rather than property damage or personal injury. The Association, for its part, denies that the negligence claim alleges only "economic loss."

■■■■ We agree with the defendants that a plaintiff may not ordinarily recover in a negligence claim for purely "economic loss." See Ellis v. Robert C. Morris, Inc., 128 N.H. 358, 364, 513 A.2d 951, 954 (1986) ("economic loss" not recoverable in negligence action; "economic loss" defined, among other things, as the decrease in value of a product because it is inferior in quality), overruled on other grounds by Lempke v. Dagenais, 130 N.H. 782, 547 A.2d 290 (1988); see also Lempke, 130 N.H. at 792, 547 A.2d at 296 ("It is clear that the majority of courts do not allow economic loss recovery in tort . . . ."); W. KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 101, at 708 (5th ed. 1984) (similar); SPEIDEL, Warranty Theory, Economic Loss, and the Privity Requirement: Once More into the

*Void,* 67 B.U. L. REV. 9, 18–19 (1987) (similar). We do not agree, however, that all of the damage alleged by the plaintiffs in their negligence claim falls within the category of "economic loss." The plaintiffs' writ, for example, asserts that, due to the defendants' negligence, "the roofs on buildings 210 and 310 Border Brook Terrace and the pool enclosure are inadequate and defective and *as a result* therefor[e] water has been allowed to flow into the buildings and units below, *causing interior as well as exterior damages.*" (Emphasis added.) We read this assertion not as a claim that the defendants' product is simply defective, but as a claim that the defendants' defective product accidentally caused harm to the condominium property. As such, it is not a claim for purely "economic loss." *See Ellis supra.* To the extent that the plaintiffs allege damage other than purely "economic loss," we find that the superior court properly refused to dismiss their negligence claim. We leave it to the court on remand to determine which particular allegations assert purely "economic loss," and which do not. Those that do assert purely "economic loss" cannot be maintained as a negligence claim.

Second, the defendants argue that the superior court erred in refusing to instruct the jury that an implied warranty is limited to latent defects discoverable within a reasonable period of time. *See Lempke,* 130 N.H. at 794, 547 A.2d at 297. The Association apparently does not disagree with this established principle and instead disputes the defendants' right on appeal to challenge the superior court's formulation of its instruction. Because we reverse this case on other grounds, we do not address the Association's procedural contentions and merely direct the superior court on remand to include in its instructions the limitation described above.

Third, the defendants contend that the plaintiffs failed to properly plead their claim against Sumner Gladstone individually, as the alter ego of the trust entity, Mt. Vernon. The defendants base this argument on the wording of the plaintiffs' pleadings: "Due to the conduct of Sumner Gladstone and his agents in the breaches of contract and torts as alleged, the *corporate* veil must be pierced and Sumner Gladstone is liable under the alter ego doctrine." (Emphasis added.) Because the plaintiffs used the term "corporate veil," rather than "corporate and trust veils," the defendants maintain that the plaintiffs should not have been allowed to sustain their action against Gladstone with regard to the actions of the trust.

This argument has little merit. The pleading containing the above language is the plaintiffs' motion to amend, in which the plaintiffs asked the superior court to "allow the following amendment to

the complaint against Sumner Gladstone, individually and as *trustee*." (Emphasis added.) The motion charges that Gladstone "commingled funds between himself, the *realty trust* and the corporation," (emphasis added), and "was in fact the entity who was in control of the construction and development" of the condominium project. We find that the plaintiffs' motion to amend, taken as a whole, adequately informed the defendants that the plaintiffs were attempting to hold Gladstone responsible for the actions of Mt. Vernon, the trust, as well as Babson-Reed, the corporation. *See* R. WIEBUSCH, 4 NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 225, at 164 (1984).

In sum, we hold that the Association had standing to sue, but that the plaintiffs' counsel's closing remarks contained improper, incurably prejudicial statements. We reverse the verdict for the plaintiffs and remand for a new trial in accordance with this opinion.

*Reversed and remanded.*

All concurred.