# United States Court of Appeals
## For the First Circuit

No. 12-1900

MASSACHUSETTS RETIREMENT SYSTEMS, Lead Plaintiff, CITY OF
BROCKTON RETIREMENT SYSTEM; PLYMOUTH COUNTY RETIREMENT SYSTEM;
NORFOLK COUNTY RETIREMENT SYSTEM,

Plaintiffs, Appellants,

RICHARD MEDOFF, individually and on behalf of all others
similarly situated,

Plaintiff,

v.

CVS CAREMARK CORPORATION; THOMAS M. RYAN;
DAVID RICKARD; HOWARD MCLURE,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Joseph N. Laplante, U.S. District Judge]

---

Before

Howard, Circuit Judge,
Souter,* Associate Justice
and Torresen,** District Judge.

---

Douglas Wilens, with whom Robbins Geller Rudman & Dowd LLP,
Joseph A. Fonti, Serena Hallowell, and Labaton Sucharow LLP were on
brief, for appellants.
Lawrence Portnoy, with whom Edmund Polubinski III, Jessica K.

---

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

**Of the District of Maine, sitting by designation.

Foschi, Jason M. Spitalnick, Davis Polk & Wardwell LLP, Willliam R. Grimm, and Hinkley, Allen & Snyder LLP were on brief, for appellees.

————————————

May 24, 2013

————————————

**HOWARD, Circuit Judge**.　This is an appeal from the dismissal of a putative class action for securities fraud against CVS Caremark Corporation and certain of its current and former employees.　For the reasons below, we vacate the dismissal and remand the case for further proceedings.

## I. Background

Because this appeal involves a dismissal for failure to state a claim, Fed. R. Civ. P. 12(b)(6), we recount the relevant facts based on the well-pleaded allegations in the complaint. SEC v. Tambone, 597 F.3d 436, 438 (1st Cir. 2010) (en banc).　At times, we borrow from the district court's thorough opinion.

### A. CVS Merges with Caremark

In November 2006, CVS Corp. ("CVS") and Caremark Rx Inc. ("Caremark") announced that they would merge.　At the time, CVS was the nation's largest retail pharmacy chain, and Caremark was the nation's second-largest prescription benefits manager ("PBM").　A PBM administers prescription drug benefits on behalf of employers, government agencies, labor unions, and other entities, known as "sponsors," that provide those benefits as part of their health insurance plans.　The sponsors pay fees to the PBM under a contract for its services, which include managing prescription drug claims submitted by those enrolled in the plan.　PBMs also negotiate the prices that the sponsors pay to drug manufacturers for their products, which are then sold either through retail pharmacies

(like CVS) that have their own contracts with the PBMs, or through the PBMs' own mail-order pharmacies. By merging, CVS and Caremark intended to provide services that only a combined retail pharmacy and PBM could offer, and to leverage their purchasing power to drive down their costs.

CVS President and CEO Thomas M. Ryan recognized that the combined company's success would depend on its ability to deliver quality service. On a conference call with analysts in November 2006, Ryan said that the combined company would "help employers and plan providers deliver the right drug at the right place at the right time." At a March 2007 conference, Ryan stated,

> No one is going to have a lower cost structure than this combined company. No one is going to be able to out-cost us in the market when we go. So, then it's all about, okay, what about service, what about product? And we think we can out-service and out-sell our competition here.

Ryan reiterated the importance of service on a May 2007 earnings call with analysts:

> I guess the two things that [plan sponsors are] most concerned about, one is that there's no degradation of service. That's the first thing. And they want to get calmed down that, as I said earlier, that we're still going to focus on execution and service and we're confident that we are.

To provide effective service, CVS would have to integrate the computer systems of its own proprietary PBM, PharmaCare, with Caremark's. A failed integration could cause mistakes in the

pricing and delivery of drugs.  One analyst expressed "serious concerns about the 'merger of equals' structure of the transaction and the heightened integration risk, given that both companies themselves have been active industry consolidators in the recent past."  In 2004, Caremark had become the then-largest PBM by merging with AdvancePCS, which itself was the product of a merger. According to a confidential witness, Caremark had a "myriad of systems, they basically let them be autonomous, and had tons of different systems so they didn't all talk to one another." Nevertheless, a few days before CVS and Caremark shareholders approved the merger, Ryan expressed confidence about the prospects for integration:

> Integration planning is on the way . . . .
> Caremark has done a lot of these.  PharmaCare
> is relatively small.  I don't mean to diminish
> any integration because there's always risk,
> but it's relatively straight-forward . . . .

CVS and Caremark completed their merger in March 2007, creating CVS Caremark Corporation ("CVS Caremark").  Ryan became the President and CEO of CVS Caremark; David Rickard, who had been the Executive Vice President and CFO of CVS, retained these titles at the merged company; and Howard McLure, who had been the Senior Executive Vice President and COO of Caremark, became the President of Caremark Pharmacy Services, a division of CVS Caremark.

## B. Misrepresentations About Service and Integration

After the merger, Ryan claimed that CVS Caremark had integrated its computer systems, was providing excellent service, and was maintaining its client base. In November 2007, Ryan said that he was "pleased that we've completed the integration of both the organization and back end systems quickly and successfully."[1] On a conference call with analysts on October 30, 2008, the first day of the class period, Ryan stated, "Even in these difficult and uncertain times . . . our PBM continues to retain existing clients and attract new ones. We will continue to gain share because . . . [w]e have excellent service." Ryan acknowledged that CVS Caremark had lost some major clients, but he said that new business would roughly offset the losses: "For 2009 revenue impact perspective, the wins and losses are in fair balance." In the following days, analysts reacted positively to the prospects of CVS Caremark's PBM business.

In January 2009, Ryan stated on an earnings guidance call that CVS had secured many of its "2009 wins" because it "repriced a significant amount of business" in order to take certain "key accounts . . . off the table and reprice early for all the reasons

---

[1] This statement, like some others mentioned here, predates the beginning of the class period on October 30, 2008. The plaintiffs claim that this statement was false, but they do not include it in the list of alleged misrepresentations upon which they base their causes of action. Therefore, we recount such statements to give context to the alleged misrepresentations that were made during the class period.

that you can imagine." This repricing included discounts not only on contracts that were up for renewal, but also on contracts that were set to expire in 2010 and beyond. According to Ryan, "over half of our PBM business received improved pricing and close to 70% of our national accounts were repriced." Reacting to this news, an analyst asked Ryan, "Is there a concern about the service for the systems and how can you get people past that also for 2010?" Ryan denied that concerns about service caused the repricing, stating that there were "[n]o trade-offs because of our service" or "hidden agenda here about giving a lower price because of lack of service." Another analyst asked Ryan whether CVS Caremark's systems "are able to talk to each other." Ryan responded, "All the systems are able to talk to each other . . . . We have got no issue with our systems." Again, analysts reacted positively to the prospects of CVS Caremark's PBM business.

CVS Caremark continued to proclaim good news as 2009 wore on. During another earnings call in February 2009, Ryan stated that in 2008, CVS Caremark's PBM business "had an excellent client retention and achieved all time industry sales and new business growth . . . . So for anyone wondering if our offerings are resonating they certainly are." CVS Caremark's Form 10-K for its 2008 fiscal year, filed later that month, struck a similarly upbeat tone: "We believe the breadth of capabilities resulting from the Caremark [m]erger are resonating with our clients and contributed

to our success at renewing existing clients and obtaining a significant number of new clients in the 2008 selling season." Rickard, the Executive Vice President and CFO of CVS Caremark, used similar language during a meeting with institutional investors on March 10, 2009, telling them that "our model is resonating in the PBM marketplace." Rickard further stated that "we have done the things strategically that needed to be done to make this merger successful." In two presentations to analysts in May, Ryan stated that "[a]s far as the 2010 pipeline . . . we're essentially on plan, in good shape," and reiterated that "[w]e are exactly where we need to be from a re-upping contract standpoint. So from the PBM side of our business, we're in good shape." On the company's earning conference call in August, Ryan forecasted earnings for 2010: "I would be very disappointed if we didn't have an [earnings per share] growth of at least 13 to 15% next year." Glowing reports from analysts followed Ryan's statements.[2]

### C. The Truth About the Merger

The complaint alleges that all of these statements concealed that the merger was, in fact, a disaster. According to confidential witnesses, problems with the integration of computer

---

[2] For example, in May 2009 an analyst from Deutsche Bank maintained a "Buy" rating for CVS Caremark and wrote that "management outlined the recent successes of CVS' unique drug retail/PBM model and cleared up lingering misinformation about how the model works and delivers value to payers, patients, and shareholders."

systems following the merger caused mistakes that contributed to the loss of major clients. Three of these clients were worth $3 billion in annual revenue to CVS Caremark: Coventry, Horizon Blue Cross Blue Shield of New Jersey ("New Jersey"), and Chrysler.

CVS Caremark lost its Medicare Part D, or "Med-D" business with Coventry in 2008,[3] and the remainder, known as the "commercial business," followed in 2009. In 2008, Rickard claimed that the loss of the Med-D business was "due in large part to price." But according to a former CVS Caremark employee, problems with the integration of computer systems often resulted in CVS Caremark representatives being unable to access participants' information. Participants also complained that they were told that they would receive a prescription drug at a certain price, but they would be given a more expensive substitute without their consent. Another former employee said that the failed computer integration and high employee turnover resulted in a "nightmare" with Coventry. CVS Caremark knew no later than October 2008 that it would be losing Coventry's commercial business, but it did not inform investors until May 2009.

CVS Caremark considered its contract with New Jersey to be "at risk" as early as the fourth quarter of 2007. Because it had failed to integrate its computer systems, CVS Caremark "had 'no

---

[3] Medicare Part D provides partial coverage for prescription drugs to Medicare beneficiaries. First Med. Health Plan, Inc. v. Vega-Ramos, 479 F.3d 46, 48 (1st Cir. 2007).

information on their formularies [i.e., the list of drugs available under a sponsor's plan], no information on their drug costs,' resulting in the denial of participant benefits," according to a former employee. In May 2008, CVS Caremark provided New Jersey with an "Error Report" that contained approximately 11,000 records. By the time these errors were substantially resolved, 10,000 more had occurred.[4] In August 2009, CVS Caremark lost New Jersey's business.

Chrysler had been a client of Pharmacare, CVS's previous in-house PBM. After the merger, CVS Caremark employees had to resort to manual data entry to get the participants' correct information into its systems, and service failures relating to the merger led to contentious meetings between the two companies. At one point, the friction was so severe that Ryan himself felt compelled to participate in a teleconference with Chrysler. As a result, CVS Caremark knew no later than mid-2008 that Chrysler was at risk for loss. CVS Caremark announced in August 2009 that it had lost a portion of Chrysler's business.

### D. CVS Caremark Discloses the Truth

On November 5, 2009, the same day that CVS Caremark reported its earnings for the third quarter of 2009, Ryan participated in another call with investors. Ryan noted that

---

[4] Former employees state that CVS Caremark had similar problems with other clients, with groups of as many as 40,000 plan participants going months without appropriate medication.

CVS-Caremark's PBM business had suffered "some big client losses" totaling $4.5 billion. He explained that "approximately two-plus billion of those came . . . since the [August] call." Specifically,

> I think you know about obviously the State of New Jersey. This was a bid that the state wanted on a stand-alone basis, so it was a kind of price and carve-out issue. We lost the State of Ohio and the managed Medicare business. It was carved in, which is about 500 plus million [dollars]. And then we had another 600 million [dollars] miscellaneous. These were basically smaller clients . . . that just really wanted essentially smaller PBMs. So in total, that was about $2 plus billion since the last call.
>
> And then, lastly, we had $1.7 billion that we lost in Med-D business . . . . So net-net, it's about $4.8 billion in loss . . . for 2010 and approximately almost [$]3.7 billion since the last call. If you look at the losses, total the losses with the Med-D and the $4.5 billion contract losses they really come from four contracts plus . . . Med-D . . . . The two really that I mentioned and then Chrysler and Coventry.

Discussing CVS Caremark's financial performance, he stated:

> [During the August analyst call] I also said I'd be disappointed if we didn't have an [earnings per share] growth of at least 13 to 15% next year for the enterprise. To get to that 13 to 15% growth rate, I expected strong double-digit growth in our retail business, which I still do, and I expected low-to-mid single digit [growth] in our PBM business, which is not going to happen. What's changed? Well, as I just said, we lost more PBM business than we expected since the [August] call, $2 billion in contracts. . . . Given all of that, it now looks like operating profit in the PBM will decline in 2010, perhaps as much

as 10 to 12%. . . . 10 percentage basis points
[sic] of the change is Med-D alone.

Ryan also announced the unexpected retirement of Howard McLure, who was the President of Caremark Pharmacy Services and, according to Ryan, "one of the chief architects of [the CVS Caremark] integrated model."

Later in the call, a market analyst asked Ryan, "why, in the long run, you're still optimistic about . . . the combined model? And maybe sort of what's gone wrong in the last year or two and why you think that's going to get better in the next year or two?" In response, Ryan acknowledged "some big losses," including "Coventry, which--we lost the Med-D business, and then we obviously expected to lose the commercial business," and "Chrysler, we lost the retirees [as opposed to Chrysler's active employees]. It's the smallest piece of it. It went to where Ford and General Motors were, with Michigan Blues," i.e., Blue Cross Blue Shield of Michigan. Ryan added, "[I]f you look at these contracts that we lost, none of them were because of the model. There were varying reasons[:] some price, one service, there were varying reasons, but none of them because of the model."

At another point in the call, an analyst asked Ryan:

But then you look at the PBM numbers, and it gives everyone heart palpitations. So number one is why are people kind of shying away from Caremark's PBM? If it's not the combined model, and you kind of said maybe it's--there must be some reason that you're not proving you're good enough to stand alone PBM [sic] to

-12-

keep those business [sic]. How do you change those people's minds?

Ryan replied, "Execution and performance, it's not the products . . . . Now we have to tweak the marketing message a little, which we're doing to make sure that it's clear about how those operate and what those actually are and when they hit and what the savings are, and the benefit to the payers."

Ryan went on to explain that "some stand-alone issues" caused the downturn in CVS Caremark's PBM business:

> the Coventry piece, when we lost Med-D, we knew we were going to lose the commercial business. There were some service issues on that one. . . . Chrysler, we still keep the [active employees]. We lost the retirees . . . . [T]here were a variety of issues. . . . I will tell you this, we didn't lose anybody that said, well, because you guys are combined with a retailer, we're leaving. None of that.

The complaint alleges that Ryan's statements during this call amounted to a disclosure of "the truth about [CVS Caremark's] failure to integrate the merged-entity, which resulted in the loss of billions of dollars in PBM contracts, and that the CVS Caremark retail-PBM model had failed to gain acceptance by customers in the pharmaceutical benefit market." The complaint further alleges that "investors reacted severely, causing the share price of CVS Caremark stock to collapse," dropping from $36.15 (the share price at the close of the market the previous day, November 4, 2009) to

$28.87 at the close of the market on the day of the earnings call (November 5, 2009), a total of roughly 20 percent.

To support this allegation, the complaint quotes from several analyst reports of the earnings call. One report said that CVS Caremark had "stun[ned] with news of additional PBM non-renewals" on the call and that the "[s]urprise nature of [this] disclosure raise[d] credibility issues" for the company's management, because "the magnitude of the loss was discovered on the call and not in the [earnings] release." Other reports observed that the "announcement show[ed] a breakdown in the Caremark model," since the company's PBM business had "lost $4.5 billion with a retention rate of only 92%," and that CVS Caremark had "provided undeniable evidence . . . that it has mismanaged the Caremark acquisition and destroyed shareholder value." One analyst considered the PBM business worthless for purposes of valuing CVS Caremark's stock: "We do not consider the value of the PBM segment in arriving at our price target. We view the PBM as essentially a free option."

Later statements by Ryan and another CVS Caremark employee reiterated the contribution of service problems to the company's performance. At a conference on November 17, 2009, Ryan stated that although

> a number of employers, unions, health plans, [plan administrators] . . . love our client service[,] . . . we dropped the ball in some client service issues that we shouldn't have.

-14-

And we're owning up to it and we're fixing it. So, that's what happened, and it obviously was a big one with Coventry because the natural falloff is we know we're going to lose the commercial business following it.

According to an article in Bloomberg Businessweek in February 2010, the new President of Caremark Pharmacy Services said that the PBM business "has five segments that haven't been fully integrated," referring to CVS and Caremark's PBM businesses and their predecessors. This statement came more than two years after Ryan said that he was "pleased that we've completed the integration of both the organization and back end systems quickly and successfully."

### E. District Court Proceedings

This action was filed in November 2009 in the United States District Court for the District of Rhode Island against four defendants: CVS Caremark, Ryan, Rickard, and McLure. In June 2010, the complaint was amended to add new allegations and new plaintiffs: the retirement systems of the City of Brockton and the Counties of Plymouth and Norfolk, Massachusetts (collectively, the "Retirement Systems").[5] The Retirement Systems claim that the defendants made material misrepresentations in violation of

---

[5] In the district court, this case was styled Medoff v. CVS Caremark Corp., No. 09-cv-554 (D.R.I.). The operative complaint is the Corrected Consolidated Class Action Complaint, filed on June 1, 2010. Richard Medoff, an individual who owned stock in CVS Caremark, was named as a plaintiff in the original complaint but not in the Corrected Consolidated Class Action Complaint.

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), as well as Rule 10b-5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. The defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. The district court granted the motion, holding that the complaint did not plausibly allege that Ryan's statements on the November 5 earnings call caused the drop in CVS Caremark's share price, with one exception: his warning that earnings per share would not grow at least 13 to 15%, as he had forecasted. The court held that Ryan's forecast could not form the basis for a claim against the defendants, however, because it was a protected "forward-looking statement" under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 77z-2(c)(1). The Retirement Systems timely appealed.

## II. Analysis

### A. Standard of Review

We review de novo an order of dismissal for failure to state a claim. Tambone, 597 F.3d at 441. In conducting this review, "we accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor." Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 5 (1st Cir. 2011) (citing Tambone, 597 F.3d at 441). "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible if it is supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While "[t]he plausibility standard is not akin to a 'probability requirement,'" it demands "more than a sheer possibility that a defendant has acted unlawfully." Id. Unless the alleged facts push a claim "across the line from conceivable to plausible," the complaint must be dismissed. Id. at 680 (quoting Twombly, 550 U.S. at 570).

### B. Loss Causation

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b). One of these rules is SEC Rule 10b-5, which prohibits any person from "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

-17-

The Supreme Court has identified six elements of a claim under Section 10(b) and Rule 10b-5:

> (1) a material misrepresentation (or omission);
>
> (2) scienter, i.e., a wrongful state of mind;
>
> (3) a connection with the purchase or sale of a security;
>
> (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation,";
>
> (5) economic loss; and
>
> (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (emphasis omitted) (citations omitted). Here, the district court focused on the element of loss causation--whether the Retirement Systems adequately alleged a causal connection between the defendants' material misrepresentations and the drop in CVS Caremark's share price that followed the November 5, 2009 earnings call.

> Plaintiffs commonly establish loss causation by
>
> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud);
>
> (2) showing that the stock price dropped soon after the corrective disclosure; and
>
> (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not

> that it was the corrective disclosure--as opposed to other possible depressive factors-- that caused at least a "substantial" amount of the price drop.

FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1311-12 (11th Cir. 2011) (footnote omitted).  Loss causation is easiest to show when a corrective disclosure is associated with a drop in share price.  In re Williams Sec. Litig.--WCG Subclass, 558 F.3d 1130, 1137 (10th Cir. 2009).

### C. The District Court's Opinion

The district court began its analysis with a statement that the defendants acknowledged could have caused the drop in CVS Caremark's share price:  Ryan's announcement that the company would fail to grow its earnings per share by 13 to 15%, as he had previously forecasted.  Such a projection is a "forward-looking statement" under the PSLRA, 15 U.S.C. § 77z-2(i)(1)(A), and one who makes a forward-looking statement cannot be liable in a private action under the securities laws if "the forward-looking statement is . . . identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  Id. § 77z-2(c)(1).  The court held that because Ryan's projection was "couched in cautionary terms" and prefaced with cautionary language, it could not support the Retirement Systems' claims.  The Retirement Systems do not challenge this ruling on appeal.

-19-

The district court then turned to the remaining alleged misrepresentations and corrective disclosures. The Retirement Systems had alleged that during the November 5 earnings call, "investors learned the truth about the Company's failure to integrate the merged-entity, which resulted in the loss of billions of dollars in PBM contracts, and that the CVS Caremark retail-PBM model had failed to gain acceptance by customers in the pharmaceutical benefit market." The court disagreed that Ryan had made statements to this effect on the earnings call, citing Ryan's denials that there was anything wrong with CVS Caremark's business model, as well as his explanations that the loss of major clients such as New Jersey and Chrysler resulted from facts specific to each client. The court acknowledged Ryan's statement that CVS Caremark had lost the Coventry contract due to "some service issues," but it pointed out that Ryan did not attribute those "service issues" to the integration of CVS and Caremark. The court held that Ryan's statements did not plausibly constitute a disclosure of CVS Caremark's failure to integrate or to gain acceptance of its business model.

The district court also examined the extent to which Ryan's statements on the earnings call merely reflected information that had been disclosed previously. The Retirement Systems admit, for example, that Ryan had disclosed months earlier that CVS Caremark had lost its contracts with Chrysler and Coventry.

Moreover, the defendants showed that The Providence Journal newspaper had reported the loss of the New Jersey contract well before the call. Therefore, the court held, the Retirement Systems did not allege a plausible theory of loss causation based on CVS Caremark's lost contracts.

Finally, the district court stated that McLure's sudden retirement, which the Retirement Systems compare to a firing, could not have plausibly caused the drop in CVS Caremark's share price. The court reasoned that when an executive leaves a company due to fraud or other problems, a drop in the company's share price results from the underlying reasons for the departure, not the departure itself. See New Orleans Emps.' Ret. Sys. v. Omnicom Grp., Inc. (In re Omnicom Grp., Inc. Sec. Litig.), 597 F.3d 501, 513-14 (2d Cir. 2010).

Based on this analysis, the district court concluded that CVS Caremark's failure to achieve Ryan's earnings forecast was the only plausible explanation for the drop in its share price. Because that forecast was a protected forward-looking statement, the court dismissed the complaint.

**D. Loss Causation Revisited**

Our review begins with the same question that the district court addressed: Could Ryan's statements on the November 5 earnings call plausibly have caused the Retirement Systems'

losses?[6]  We agree with the district court that one plausible cause of this loss was Ryan's announcement that CVS Caremark would not achieve the earnings growth that he had previously forecasted, an announcement that the Retirement Systems no longer claim as supporting liability.  To allege loss causation here, then, the Retirement Systems must allege that Ryan's other statements were a "substantial" cause of their losses.  FindWhat, 658 F.3d at 1309; Hartman v. Gilead Scis., Inc. (In re Gilead Scis. Sec. Litig.), 536 F.3d 1049, 1055-56 (9th Cir. 2008); McCabe v. Ernst & Young, LLP, 494 F.3d 418, 425 (3d Cir. 2007).

The Retirement Systems claim that the November 5 call revealed two categories of previous representations to be false: that CVS Caremark's business model had gained acceptance in the marketplace, and that the company could deliver quality service because it had fully integrated its back-end systems.  As to the acceptance of CVS Caremark's business model, the complaint does not allege that clients rejected the idea of a combined PBM and retail pharmacy.  Therefore, the Retirement Systems fail to state a claim

---

[6] It is unclear whether a plaintiff may plead loss causation with "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), or if there is a heightened standard akin to the rule that "a party must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b).  See Lormand v. US Unwired, Inc., 565 F.3d 228, 258 (5th Cir. 2009) (applying Rule 8(a)(2)); Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011) (applying Rule 9(b)).  Here, the Retirement Systems' allegations are specific enough that the outcome would be the same under either standard.

regarding the business model itself. But the complaint does allege that the defendants misrepresented the success of CVS Caremark's integration and the quality of its service. According to the complaint, Ryan told the market that CVS's and Caremark's systems had been integrated shortly after the merger of the two companies. Ryan later told analysts that a worrisome repricing of contracts was unrelated to concerns about CVS Caremark's service, and he reiterated that CVS's systems were working with Caremark's. Several facets of the November 5 call, however, revealed that Ryan's previous statements were misrepresentations. For example, Ryan admitted for the first time that the Coventry contract was lost in part due to "service issues," and McLure's sudden retirement indicated problems with the "integrated model" that he had built. After the call, analysts understood that CVS Caremark had mismanaged the acquisition and damaged the PBM business. The market reacted accordingly, driving down CVS Caremark's share price by twenty percent. Later statements by CVS Caremark employees confirmed that the analysts were correct in their assessment of the problems with the PBM business.

The defendants argue that the complaint nevertheless fails to plausibly allege loss causation for three reasons. First, there was no corrective disclosure because Ryan never said on the November 5 call that there were problems with the integration of CVS Caremark's systems. Second, the market knew well before the

call that CVS Caremark had lost its contracts with Coventry, New Jersey, and Chrysler. Third, the Retirement Systems cannot support their theory of loss causation with analysts' reactions to Ryan's statements. We find these objections unpersuasive.

### 1. Lack of Corrective Disclosure

The district court concluded that the November 5 call could not have been a corrective disclosure because Ryan did not state on the call that CVS Caremark had failed to integrate its systems. In fact, Ryan attributed the company's lost contracts to stand-alone issues with particular clients. But a corrective disclosure need not be a "mirror-image" disclosure--a direct admission that a previous statement is untrue. Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 230 (5th Cir. 2009); In re Williams, 558 F.3d at 1140. To be sure, the corrective disclosure must relate to the same subject matter as the alleged misrepresentation. FindWhat, 658 F.3d at 1311 n.28; In re Williams, 558 F.3d at 1140; Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005). But a defendant's failure to admit to making a misrepresentation, or his denial that a misrepresentation was made, does not necessarily preclude loss causation. Flowserve, 572 F.3d at 230 ("If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements. And if a 'complete' corrective disclosure

-24-

were required, defendants could immunize themselves with a protracted series of partial disclosures." (citation omitted) (internal quotation marks omitted)).

Instead, the appropriate inquiry is whether the November 5 call, as a whole, plausibly revealed to the market that CVS Caremark had problems with service and the integration of its systems. Four aspects of the call lend plausibility to this theory of loss causation.

First, Ryan disclosed for the first time that "service issues" had led to the loss of the Coventry contract, a statement that the Retirement Systems interpret as an admission that the failed integration of CVS Caremark was responsible for the loss of a major client. The district court disagreed with this interpretation because Ryan did not attribute those "service issues" to the integration. We believe that the complaint supports the conclusion that the "service issues" resulted from poor integration, and that the market could plausibly have drawn this conclusion. From the time the merger was announced, analysts had questioned CVS's ability to integrate with Caremark. One analyst expressed "serious concerns" about "the heightened integration risk, given that both companies themselves have been active industry consolidators in the recent past." Shortly after the merger was completed, Ryan told analysts that the "first thing" that concerned plan sponsors was the possibility that the merger

would degrade service. When Ryan announced in January 2009 that CVS Caremark had repriced half of its business, one analyst asked if the reason for the repricing was "a concern about the service for the systems," to which Ryan responded that "there was no hidden agenda here about giving a lower price because of lack of service." Given these concerns, it is reasonable to infer that the market understood Ryan's statement about "service issues" with Coventry to imply problems with integration, which would have corrected Ryan's previous statements that the integration had proceeded smoothly. The complaint bolsters this inference with statements from confidential witnesses that problems with the merger of information systems affected CVS Caremark's relationship with Coventry.

Second, the alarm of the market following disclosure of the magnitude of CVS Caremark's lost business likely reflected an understanding that something systemic had gone wrong. Although it was known that CVS Caremark had lost its contracts with Coventry, New Jersey, and Chrysler, the company had announced the size of only the contracts with Coventry ($1.4 billion) and Chrysler ($400 million). As Ryan put it, "approximately $2-plus billion" of CVS Caremark's contract losses occurred after the previous earnings call. Ryan also told analysts that the PBM business's operating profit would decline by "as much as 10% to 12%." Asking Ryan about these results, one analyst said that "it gives everyone heart palpitations." The only systemic failure likely to produce these

numbers and reactions was a failure to integrate the PBM systems, and when analysts wrote scathing reports in response to the news, one wrote off the entire value of the PBM business for purposes of valuing CVS Caremark's shares.

Third, analysts noticed a wide discrepancy between CVS Caremark's November 5 earnings press release and Ryan's description of the PBM business. In the press release, Ryan mentioned "solid performance in our PBM" in the third quarter of 2009, but he waited until the call to disclose that CVS Caremark had lost billions of dollars of PBM business since the previous quarterly earnings call in August. One analyst reacted to the discrepancy by writing that "the magnitude of the loss was discovered on the call and not in the release. Surprising market participants with bad news on an earning call tends to lead to questions about credibility with respect to everything from earnings guidance to the business model itself."

Fourth, McLure's retirement alerted the market to problems with the PBM business. McLure was the President of Caremark Pharmacy Services, and according to Ryan, he was a "chief architect[] of [the] integrated model." The retirement came as a surprise, and it occurred before CVS Caremark had found a successor. One analyst wrote that "the suddenness of the retirement of Howard McLure, Caremark's President, leads us to

believe that his departure was not exactly voluntary . . . . What this means for future business retention is uncertain."

Perhaps the market did not perceive every detail of CVS Caremark's struggles, but it knew enough to drive down the price of CVS Caremark shares by 20%.[7]  The Ninth Circuit addressed a similar situation in Sparling v. Daou (In re Daou Systems, Inc.), 411 F.3d 1006 (9th Cir. 2005), in which a company had concealed that it was using an improper technique to recognize revenue prematurely. Eventually the company revealed that it had a high level of unbilled receivables, which the plaintiffs alleged was the result of this improper technique.  Id. at 1025-27.  The price of the company's stock dropped sharply, although the market did not know the exact reason for the high level of unbilled receivables; one analyst said that "[w]hen you say one thing on the conference call and report something different on the [quarterly financial report], that raises concern. . . . You have got to question whether they are manufacturing earnings."  Id. at 1026.  The company later confirmed that it had improperly recognized revenue.  Id.  The court concluded that the plaintiffs' allegations were "sufficient to provide [the company] with some indication that the drop in [its] stock price was causally related to [its] financial

_____

    [7] If this case proceeds, it will be up to the Retirement Systems to prove how much of this drop resulted from revelations about CVS Caremark's integration, which are actionable, and how much resulted from disappointment in CVS Caremark's projected earnings, which is not actionable.

-28-

misstatements reflecting its practice of prematurely recognizing revenue before it was earned." Id. (citing Dura, 544 U.S. at 347). We agree with the Ninth Circuit's approach, and we believe that the result here is the same. The Retirement Systems' allegations indicate that the drop in CVS Caremark's share price was causally related to its misstatements regarding the integration of CVS and Caremark, and these allegations are sufficiently plausible to foreclose dismissal.

### 2. Public Knowledge of Contract Losses

The defendants point out, as did the district court, that CVS Caremark's loss of Coventry, New Jersey, and Chrysler as clients was public knowledge well before the November 5 call. In fact, CVS Caremark had already disclosed the revenue impact of the lost Coventry and Chrysler contracts. Therefore, the defendants argue, Ryan's discussion of the loss of these contracts could not have been a corrective disclosure. See In re Omnicom, 597 F.3d at 512 ("What appellant has shown is a negative characterization of already-public information. A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." (citations omitted)).

The Retirement Systems respond that their allegations go beyond the mere loss of these contracts. Instead, they allege that during the November 5 call, the market learned for the first time

-29-

the real reason for the loss: the failed integration of CVS and Caremark.[8] That information, not the loss of the contracts themselves, is the corrective disclosure at the heart of the Retirement Systems' claims. As described above, various aspects of the call allegedly revealed that the integration had failed: the identification of "service issues" as a reason for the loss of the Coventry contract, the first disclosure of the full value of lost contracts, the discrepancies between CVS Caremark's earnings press release and Ryan's statements on the call, and McLure's sudden retirement. Despite the earlier disclosure of CVS Caremark's lost contracts, this new information could plausibly have caused the Retirement Systems' losses.

### 3. Use of Analyst Reports

The district court discounted the complaint's reliance on analyst reports, stating that the Retirement Systems failed to "explain how these analysts' remarks, harsh as they were, can serve to alter the nature of what Ryan actually said during the November 5 earnings call." Although the reports cannot alter Ryan's words,

---

[8] The Retirement Systems also question whether the market was fully aware of CVS Caremark's loss of the New Jersey contract prior to November 5, even though the loss had been previously reported in two articles, one published online and the other in The Providence Journal. Because the Retirement Systems pleaded the reliance element of their claims by alleging that the market for CVS Caremark stock was "open, well-developed, and efficient," meaning that the price of the stock incorporated available material information, see Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988), they cannot now claim that the market was unaware of information reported in a major Rhode Island newspaper.

the Retirement Systems argue that they reflected the meaning of those words in the market in which they were used. Cf. Stuebler v. Xcelera.com (In re Xcelera.com Sec. Litig.), 430 F.3d 503, 514 (1st Cir. 2005) ("[T]he existence of a significant number of analysts implies that company reports are closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." (internal quotation marks omitted)). We agree.[9]

When a plaintiff alleges corrective disclosures that are not straightforward admissions of a defendant's previous misrepresentations, it is appropriate to look for indications of the market's contemporaneous response to those statements. To preclude a plaintiff from relying on analyst reports that expose the limitations of a defendant's statements could permit the defendant to "defeat liability by refusing to admit the falsity of its prior misstatements." Flowserve, 572 F.3d at 230. For example, in In re eSpeed, Inc. Securities Litigation, 457 F. Supp. 2d 266 (S.D.N.Y. 2006), the plaintiffs alleged that eSpeed, a brokerage company, had concealed that it was alienating customers and harming its financial performance by allowing some customers to obtain better trade executions by paying higher commissions. Id. at 271-76. Following eSpeed's disclosure of disappointing financial results, an analyst asked its CEO on a

---

[9] The Retirement Systems also contend that the analyst reports constituted corrective disclosures by themselves, even in the absence of Ryan's statements. We do not reach this argument.

conference call whether animosity toward this practice had affected the company's market share. Id. at 276. The CEO denied this, but a news article about the conference call, published the next day, posited a connection between eSpeed's pricing structure and its poor financial results. Id. at 296-97. The court held that the CEO's exchange with the analyst, on its own, could not sustain the plaintiffs' allegations that "disclosure regarding [eSpeed's pricing structure] was a proximate cause of the economic loss," id. at 296, but the subsequent article "could establish that, despite [the CEO's] specific denial, the market understood by the end of the putative class period what it did not before--that the 'new fees' or 'new charges' entailed by [eSpeed's pricing structure] were damaging eSpeed's market share and financial performance," id. at 297.

Here, Ryan did not admit on the November 5 call that he had misrepresented the success of the merger, but various aspects of the call, taken together, plausibly could have alerted the market that the merger had been unsuccessful. In particular, the contemporaneous analyst reports could have represented the market's understanding that the PBM business's poor performance was not a mere stumble but a signal that the merger had failed to produce any value for CVS Caremark. Therefore, the analyst reports should have been considered in deciding the motion to dismiss.

**E. Other Elements of the Retirement Systems' Claims**

Although the district court based its decision exclusively on loss causation, the defendants argue that we can nevertheless affirm the decision because the Retirement Systems failed to plead an actionable misstatement or omission by the defendants.[10] While it is true that the failure to plead an actionable misstatement or omission would support dismissal of the Retirement Systems' claims, the parties' briefing on this issue is abbreviated, so we think it best to allow the district court to consider this argument in the first instance. The same is true for the scienter element of the Retirement Systems' claims, which was briefed before the district court but not on appeal. Instead of reversing the district court's decision, then, we will vacate it to allow the court to consider alternative grounds for dismissal if it chooses.

### III. Conclusion

For the reasons above, we **vacate** the dismissal of the complaint and **remand** for further proceedings consistent with this opinion. Costs are awarded to the appellants.

---

[10] For example, the defendants claim that the alleged misrepresentations were puffery, meaning that they were "too general to cause a reasonable investor to rely upon them." ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009). In this opinion, we have assumed without deciding that the Retirement Systems have adequately alleged the elements of their claims other than loss causation.

-33-