Merrimack
No. 88-141

ROSS SEYMOUR AND VIRGINIA SEYMOUR

v.

NEW HAMPSHIRE SAVINGS BANK

July 13, 1989

754

*Rinden P.A.*, of Concord (*Paul A. Rinden* on the brief and orally), for the plaintiffs.

*Sulloway Hollis & Soden*, of Concord (*Robert M. Larsen* on the brief and orally), for the defendant.

SOUTER, J.  After a bench trial in the Superior Court (*Mangones, J.*), the plaintiffs appeal from an unfavorable verdict rejecting claims that the defendant violated contractual and fiduciary duties in failing to guard against unworkmanlike performance of a construction contract financed by the defendant's mortgage loan to the plaintiffs. We affirm.

In 1983, the plaintiffs, Ross and Virginia Seymour, decided to divide their house into three apartments, and on the advice of an independent appraiser they considered hiring one Warren Dobbins to do the work. When Mrs. Seymour first spoke to an officer of the defendant, New Hampshire Savings Bank, about the possibility of a loan to finance the project, he advised her to get two cost estimates and mentioned another contractor, named Stevens. The plaintiffs obtained estimates from each builder, Dobbins's being the

lower by $5000. When Mrs. Seymour mentioned to a second loan officer of the bank that she and her husband were considering Dobbins for the job, the loan officer replied that Dobbins enjoyed a fine reputation and had done some good work that the officer had seen.

In January, 1984, the bank granted the Seymours' application for a construction loan, and on March 19, 1984, the Seymours executed the required documents. They signed a note for a principal of $46,500, a mortgage, and a "Borrowers and Lenders Agreement" (B & L), and they received a copy of the bank's "Construction Loan Disbursement Policy" (Disbursement Policy). On April 3, the Seymours executed a contract with Dobbins for the conversion work, the scope of which was left largely to understandings informally expressed, there being no written time-table for its execution, save for a completion date, and no written plans or specifications of its details.

Insofar as the loan documents bear on the instant action, they can be reviewed briefly. The B&L agreement provided that the Seymours would "institute [the] construction work and carry the same to completion in a workmanlike manner on or before October 19, 1984" and would apply the loan's proceeds to "said purposes." They agreed to make prompt payment of all bills for work done, to furnish the bank with receipts and to keep the bank informed about the progress of the work. The parties agreed that the bank's disbursements of proceeds would "be conditioned upon receipt of evidence satisfactory to the Bank that . . . said work is being conducted in a workmanlike manner, [and that] the amounts theretofore loaned by the Bank have been applied toward said work . . . ." The Disbursement Policy required the Seymours to execute an "Authorization to Withdraw" form, to be presented to the bank at least three business days prior to any requested disbursement from the loan account. The bank charged the Seymours a $25 "inspection fee," to which the Disbursement Policy referred in its provision that the "inspection fee covers four inspections during the construction phase. Inspections will be made at the discretion of the Bank and if additional inspections are necessary, the Bank will charge a fee of $25 for each additional inspection." The subject of inspection was also addressed by the mortgage provision that the bank might make "reasonable entries upon and inspections of the Property, provided that [the bank] shall give [the Seymours] notice prior to any such inspection specifying reasonable cause therefor related to [the bank's] interest in the Property."

Although the Seymours authorized three disbursements to Dobbins, when he made his fourth request for payment in early July 1984, they hesitated to approve it, out of misgivings about the quality of some of his work and the time he was taking to do it. When Dobbins told them he was about to start a new job, the Seymours voiced their apprehension to a vice president of the bank and asked when the bank intended to inspect the work. He replied that there would be only one inspection, at the completion of the project, given Dobbins's good reputation. The Seymours then asked whether they should honor Dobbins's latest statement. The bank officer replied that since the Seymours themselves indicated Dobbins had been working on the project and was presumably owed something, he would advise them to pay. They authorized the further disbursement, bringing the total to $24,500.

When they gave Dobbins his check on July 6, the Seymours expressed their concerns and received his reassurance. Thereafter, the Seymours presented a fifth disbursement authorization to the bank and paid another $2,630.89 to Dobbins on July 13.

Dobbins's next statement came on August 6, but this time Mrs. Seymour refused the request until he corrected certain work thought to be defective and furnished a schedule for completion of the project. Dobbins did neither, but promptly left with his employees and materials. In the aftermath of his departure a bank inspector noted that "[w]ork has not been performed in a professional and workmanlike manner." The Seymours hired one Butler to complete the job, to whom they authorized seven disbursements by the bank.

The Seymours then separately sued Dobbins, who settled for $4,000, and the bank, which obtained a defendant's verdict after a full bench trial. In this appeal, the Seymours espouse theories of contractual obligation and fiduciary duty, on which they maintain that the trial court should have held the bank liable both for the disbursement of loan proceeds compensating Dobbins's allegedly inadequate performance, and for the costs of remedial work and delay in renting the apartments.

The claim that the bank had a contractual duty to inspect on the plaintiffs' behalf, and to guard them from poor workmanship, is said to rest on provisions found in three of the documents already summarized. The B&L agreement requires evidence of workmanlike construction and of application of prior payments to the project as a condition of the bank's obligation to disburse funds, and the plaintiffs point to the mortgage provision entitling the bank to inspect, as well as to the Disbursement Policy's explanation that

the inspection fee covers four inspections. They argue that they were thus entitled to infer that the bank would guard their interest by inspecting the construction to ensure its quality and to verify the application of the disbursements to the job at hand.

If this argument has any plausibility, however, it depends on ignoring the cardinal rule that each contractual instrument is to be read as a whole, *Kilroe v. Troast*, 117 N.H. 598, 601, 376 A.2d 131, 133 (1977), for when the provisions isolated above are returned to context, any implication of contractual duty disappears. It will be recalled that the Disbursement Policy spoke of the bank's inspection or inspections as discretionary, while the mortgage expressly conditioned the bank's right of entry for inspection upon demonstrating reasonable cause related to the bank's interest in the property, not to the Seymours' interest. Most telling of all, of course, was the Seymours' undertaking in the B&L agreement to "institute [the] construction and carry the same to completion in a workmanlike manner . . . ." Thus, as between the Seymours and the bank, the Seymours expressly assumed responsibility for workmanlike quality, an obligation underscored by the bank's right to insist on "evidence satisfactory to the Bank that . . . [the] work is being conducted in a workmanlike manner, [and that] the amounts theretofore loaned . . . have been applied toward said work . . . ." The Seymours' responsibility for workmanship could not escape any reasonable reader of these documents.

The Seymours make a further try at salvaging the contract claim by asserting that bank officers orally agreed to shift the Seymours' responsibility to the bank, pointing to a loan officer's alleged remark that the bank's inspections would be a "safe guard and well worth it." They conveniently forget, however, that they never asked the trial court for a specific finding that the remark was made, and that the court "neither granted nor denied" a request to find that "in addition to the mortgage documents stating that the bank would conduct periodic inspections, the Seymours were told [by a loan officer] . . . that they could count on the inspections being conducted at various stages." (The request was "neither granted nor denied," presumably because it contained more than one proposition and was not, therefore, subject to a simple yes or no ruling.) There is consequently no predicate in the trial court's findings even to claim the existence of an oral component of the contract at odds with the clear written terms.

The trial court, indeed, got no closer to the possibility of an oral modification of the written contract than its finding that the bank's vice president advised the Seymours to make the July 6

payment. It could not be clearer, however, that the banker based that advice on what the Seymours had told him about the contractor's activities, and whether it was good advice or bad, it can not reasonably be seen as assuming a duty to protect the Seymours against poor workmanship. There is accordingly no indication that the trial court erred in finding for the bank on the contract issue.

The claim for breach of fiduciary duty to protect the Seymours stands on a different footing, not on principles of contract but on the holding in *Lash v. Cheshire County Savings Bank*, 124 N.H. 435, 474 A.2d 980 (1984), that a commercial mortgagee without authority to disburse the proceeds of a mortgage loan violates a fiduciary obligation to the borrower, "wherever influence has been acquired and abused [by the lender] or confidence has been reposed and betrayed," *id.* at 438, 474 A.2d at 981 (citations omitted). The Seymours argue that the bank acquired influence and gained their confidence in the course of the discussions we have touched on before. They maintain that the bank officials' recommendations of Dobbins, their representations about the bank's inspection practices and their remarks about the value of those inspections to the borrowers led the Seymours to place confidence in the bank's oversight of the quality and progress of the work.

The differences, however, between *Lash* and the instant case are several. The bank in *Lash* directly disbursed the portion of loan proceeds in question for its own benefit and that of another creditor without the plaintiffs' authorization; in this case the Seymours approved every disbursement, and neither the bank nor any other borrower got any benefit from the payments made. But even without these distinctions, the trial court's denials of the Seymours' requests for findings on the issues of influence and confidence would be as fatal to the fiduciary claim as to the allegation of an oral contract. The court denied requests to find that the bank's agents had recommended Dobbins and had led the Seymours to believe they could depend on bank inspections to protect their own interest. The court also denied two separate requests to find that the Seymours had relied on a promise by the bank to make inspections during construction. Thus there simply are no factual premises upon which the acquisition of influence and confidence could be predicated as a source of fiduciary responsibility. To put it plainly, the trial court did not believe the Seymours. (The same want of any basis in facts found by the trial court likewise dooms the Seymours' suggestion that the bank could be held liable under the principle of § 323 of the Restatement (Second) of Torts, that

one who undertakes services apparently necessary to protect the person or property of another is liable for physical harm resulting from failure to perform with due care, if the other's reliance exposes him to that harm.)

Nor is it remarkable that the factual foundations of contractual and fiduciary duties were found wanting in this case. There is nothing inherent in the mere act of lending money to suggest that the lender thereby takes responsibility for spending the proceeds on the stated purpose of the loan, or for the borrower's competence in doing so, and the standard instruments of commercial loan transactions are unlikely to suggest otherwise. While we would not presume to hold that dealings between a commercial lender and its borrower could never give rise to contractual or fiduciary obligations of the sort claimed here, the normal incidents of these loan agreements justify the prevailing rule in the related context of the law of negligence, to which the trial court referred, that

> ". . . no duty is imposed upon a lender of a construction loan to exercise reasonable care in its inspection of the borrower's premises, even where the borrower pays the lender's inspection fee, unless the lender voluntarily undertakes to perform such inspection on behalf of and for the benefit of the borrower.
>
> ". . . [T]he burden is on the borrower, seeking to impose liability, to prove the lender's voluntary assumption of activities beyond those traditionally associated with the normal role of a money lender."

*Thormahlen v. Citizens Savings and Loan*, 698 P.2d 512, 517 (Or. App. 1985) (quoting *Rudolph v. First Southern Federal Sav. & Loan*, 414 So. 2d 64, 71 (Ala. 1982)).

*Affirmed.*

BROCK, C.J., did not sit; the others concurred.