[No. D010694. Fourth Dist., Div. One. Apr. 11, 1991.]

ROBERT J. FELTON, Plaintiff and Respondent, v.
MARCUS SCHAEFFER et al., Defendants and Appellants.

COUNSEL

Neil, Dymott, Perkins, Brown & Frank, Robert W. Harrison and Mark A. Birmingham for Defendants and Appellants.

F. J. Bloomingdale and Howard Alan Kitay for Plaintiff and Respondent.

OPINION

FROEHLICH, J.—Defendants Marcus Schaeffer, M.D. (Schaeffer) and Kearny Mesa Industrial Medical Centers, a California corporation, doing business as Industrial Medical Centers (IMC) appeal from a judgment entered against them and in favor of respondent Robert J. Felton (Felton) in the amount of $67,210. The action arose out of an alleged negligent preemployment physical examination of Felton.

Schaeffer and IMC (collectively appellants) raise three contentions on appeal. First, appellants argue no action lies against them because they breached no duty owed to Felton, never having had a physician/patient relationship with Felton. Second, they argue that even if a duty of care existed, the court prejudicially erred in its instructions to the jury. Finally, appellants contend there is no substantial evidence to support the verdict. After reviewing the factual and procedural history, we will address appellants' first claim, which we view as dispositive.

I. *Factual Background*

The evidence, viewed most favorably in support of the verdict (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]), reflects that in January 1987 Felton, who was then employed by the La Mesa-Spring Valley School District (La Mesa), learned of a job opportunity as a maintenance supervisor with the Grossmont Union High School District (Grossmont). Felton submitted his application and was selected for the job subject to, among other things, a satisfactory report on his physical condition as determined by a preemployment physical examination. Felton's starting date was to be April 10, 1987.

The preemployment physical examination was conducted on March 25, 1987. Felton, who was instructed not to eat or drink anything after 12:00 a.m. the day of the examination, did not take his antihypertension medication prior to the examination. Since 1983 Felton has had hypertension, for

which he faithfully has taken his prescribed medication each day except for the day of the examination.

On arriving at IMC, Felton completed a written health history questionnaire, on which he indicated he was taking medication twice daily for high blood pressure. After a waiting period he was escorted to a lab, where a blood pressure reading immediately was taken. He then was placed in a waiting room into which Dr. Horowitz entered. Dr. Horowitz reviewed the paperwork and commented that Felton's blood pressure was a little elevated, to which Felton responded, "It's because I didn't take any [medication] this morning." There was no further discussion concerning Felton's blood pressure. Dr. Horowitz formed the impression Felton was not taking his medication on a regular basis.

Following the examination Dr. Horowitz made notations to request certain records pertaining to Felton's other health conditions, but did not request any records pertaining to his hypertension treatment or status. Felton executed consent forms for the release of records pertaining to his other health conditions, as requested by IMC, but was not asked to sign forms to obtain records pertaining to his hypertension. It was customary for IMC to obtain consent forms for release of records relating to any condition causing a doctor concern and about which additional information was desired. Dr. Schaeffer indicated the failure to obtain a form of release for records pertaining to Felton's hypertension was an oversight.

Dr. Horowitz's summary of his findings, prepared March 27, indicated "no decision" could be reached without further information. Dr. Schaeffer was responsible for reviewing the results of all preemployment physical examinations. He understood Grossmont needed a verbal report within 48 hours of Felton's examination and a final evaluation not later than April 10, its target date for filling the position. Accordingly, after reviewing Dr. Horowitz's summary evaluation, Dr. Schaeffer phoned Grossmont to indicate the existence of a potential problem relating to Felton's medical condition and, on April 7, prepared a form conveying his opinion "no decision" on Felton could be made without further cardiovascular tests.

Dr. Schaeffer opined, based on conversations with Dr. Horowitz, that Felton was not taking the prescribed medication for hypertension on an ongoing basis, causing Dr. Schaeffer concern. Dr. Schaeffer indicated to Grossmont he would make a decision on Felton's physical qualifications based on whatever information he could acquire prior to the April 10

deadline, but he apparently made no attempt to obtain records relating to Felton's hypertension problem.[1]

Dr. Schaeffer executed his final evaluation on April 9, finding Felton unsuited for employment because of his "noncompliance with antihypertensive treatment" but indicating Felton might qualify if he were to "demonstrate[] compliance for six months." The sole basis for the "unsuitable" finding related to Felton's high blood pressure reading, his medical history and his alleged noncompliance with the antihypertension regimen.

On April 14, Felton first learned he would not be hired by Grossmont. On April 16, Dr. Schaeffer informed Felton he had failed the examination due to uncontrolled high blood pressure but could reapply if he showed six months of compliance. That same date Grossmont informed Felton it was going to hire another person for the job. Felton eventually learned Grossmont had hired another person. Having resigned from his previous job effective April 9, Felton reapplied for that position and was told he would be required to pass a physical examination. On May 1, Felton underwent and passed the second physical examination, conducted by a different branch of IMC which used different procedures for taking blood pressure readings. He then was rehired by La Mesa.

There was evidence Dr. Schaeffer's opinion of "unsuitability" was based on inadequate information and potentially inaccurate test results. Dr. Schaeffer admitted he lacked sufficient information to make a more accurate decision and would have preferred the advantage of additional information; however, pressed by Grossmont's time constraints, he made the decision based on the information then available. The evidence also suggested the elevated blood pressure reading of March 25 may have been inaccurate.

Dr. John G. Lockie testified that numerous factors can skew and elevate a blood pressure reading, including stress, an instrument's cuff size, elevation of the arm relative to the heart, transition from walking to a sitting position immediately before a reading is taken, and failure to take antihypertension medication on the day of the examination. He further indicated because of these possible influences on blood pressure he would remeasure any elevated readings. He concluded that given the circumstances under

---

[1] Dr. Schaeffer claimed he had two phone conversations with Felton prior to the deadline, asking for Felton's assistance in obtaining certain records, including those pertaining to Felton's hypertension control regimen. However, Felton testified the only information he was asked to obtain for IMC were records on an unrelated problem, which records he did obtain.

Although Felton had told Dr. Horowitz he was being treated for hypertension, and listed a Dr. Lockie as Felton's physician on his questionnaire, Dr. Schaeffer did not attempt to contact Dr. Lockie, who was in fact the treating physician for Felton's hypertension.

which Felton's reading was taken,[2] such reading would not be considered "very meaningful." IMC did not retest Felton's blood pressure.

## II. *Procedural History*

Felton filed a complaint for damages, alleging because appellants "performed their duties as medical doctors so negligently, carelessly, and below the standard of care to be followed in the practice of medicine," he was rejected for the job he sought at Grossmont. Appellants subsequently moved for summary judgment or summary adjudication of issues, contending they had no physician/patient relationship with Felton and hence owed no duty to Felton, relying on *Keene* v. *Wiggins* (1977) 69 Cal.App.3d 308 [138 Cal.Rptr. 3]. The trial court denied the motion, concluding (1) *Keene* was inapplicable to a preemployment physical examination; (2) Felton's action was for common law negligence rather than medical malpractice; and (3) appellants owed Felton a duty of due care.

Jury trial commenced April 17, 1989. During trial appellants timely moved for a nonsuit and a directed verdict, both of which were denied. The jury returned a special verdict, finding Schaeffer and IMC negligent, and judgment was entered for damages of $67,210, comprised solely of Felton's economic losses and pain and suffering. Appellants' subsequent motions for judgment notwithstanding the verdict or for new trial were denied.

We conclude that appellants' conduct was not actionable either as medical malpractice or common law negligence, because the gravamen of Felton's claim was that appellants' misdiagnosis breached a duty of care owed to Felton. However, because the physician/patient relationship is absent here, any duty to use due care in evaluating Felton's medical condition was owed to the employer rather than Felton.

## III. *Because There Was No Physician/Patient Relationship Between Appellants and Felton, Appellants' Misdiagnosis of Felton's Medical Condition Is Not Actionable in Negligence or Medical Malpractice*

■ It is undisputed that appellants evaluated Felton solely for purposes of a preemployment physical examination and that such examination was conducted at the request of the employer. It is equally clear Felton did not visit appellants for medical treatment or advice, nor did Felton seek or decline to seek medical treatment in reliance on the evaluation. Under these

---

[2] It appears only a single reading was taken—on the day Felton skipped his medication and immediately after he had moved from a sedentary to an upright position and walked down a long hallway. The reading also apparently was taken using an undersized cuff, which can cause higher readings than those taken with a proper cuff.

facts Felton has no claim in ordinary negligence or medical malpractice based on the alleged misdiagnosis contained in IMC's report.

In *Keene* v. *Wiggins, supra,* 69 Cal.App.3d 308, this court held an examinee had no malpractice or negligence claims against an examining doctor on facts parallel to those of this case. In *Keene* the plaintiff was examined by a doctor who was hired by, and whose report was for the benefit of, the employer's workers' compensation carrier. The examination was solely for purposes of rating the plaintiff's injury and not for care or treatment. In rejecting the plaintiff's malpractice claim against the doctor, this court held that no duty to plaintiff had been breached, stating:

". . . [I]t is apparent where a doctor conducts an examination of an injured employee solely for purpose of rating the injury for the employer's insurance carrier, . . . [and] neither offers or intends to treat, care for or otherwise benefit the person examined, and has no reason to believe the person examined will rely on this report, the doctor is not liable to the person . . . examined for negligence in making that report. His duty . . . of care . . . runs only to the carrier and to the employer requesting it." (69 Cal.App.3d at pp. 313-314.)

The *Keene* court's finding of "no duty," while evaluated under the matrix of factors listed in *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], also accords with the nearly unanimous views of other jurisdictions. We independently have reviewed out-of-state authorities and find overwhelming agreement[3] that a physician has no liability to an examinee for negligence or professional malpractice absent a physician/patient relationship, except for injuries incurred during the examination itself. Thus, in *Lotspeich* v. *Chance Vought Aircraft* (Tex. 1963) 369 S.W.2d 705, the court concluded that a doctor, hired by an

---

[3] We have found only two departures from the majority view, neither of which is entitled to significant weight. The first case, *Armstrong* v. *Morgan* (Tex. 1976) 545 S.W.2d 45, although concluding a duty existed to an examinee, grounded its holding on only two authorities—a quotation from Prosser and an American Law Reports annotation. However, the cited annotation (found at 10 A.L.R.3d 1071) contains many of the same cases we cite below as supportive of the opposite and majority view of *no* duty, and hence undercuts rather than supports *Armstrong.* Moreover, *Armstrong* is a Texas case, yet makes no effort to reconcile its result with the contrary conclusion reached by *Lotspeich, post.* In light of the weak authority for *Armstrong*'s conclusion and the status of Texas law (both before and after *Armstrong*), *Armstrong* is of questionable strength. The only other case finding the physician owed a duty to an examinee beyond the examination itself is *Ewing* v. *St. Louis-Clayton Orthopedic Group, Inc.* (8th Cir. 1986) 790 F.2d 682. However, *Ewing* cited only two cases in support of its conclusion—*Armstrong*, whose weaknesses we have just chronicled, and a California case (*Olson* v. *Western Airlines, Inc.*▮ (Cal.App.) which was ordered depublished.

employer to conduct preemployment physical examinations of prospective employees, does not have a physician/patient relationship upon which the examinee can premise a medical malpractice claim for failure to discover a medical condition. Instead, the only duty owed by the doctor to the examinee is to use care so as to avoid injury during the examination. Other Texas courts have agreed. (See, e.g., *Johnston* v. *Sibley* (Tex. 1977) 558 S.W.2d 135 [doctor conducting workers' compensation examination owes duty of care regarding report only to employer].) The majority's view of "no duty" has also been adopted in New York (see *LoDico* v. *Caputi* (1987) 129 A.D.2d 361 [517 N.Y.S.2d 640] [unless employer's doctor provides treatment or advice which plaintiff relies upon to obtain or refrain from obtaining medical treatment, doctor not liable for erroneous report]); Ohio (see *Meinze* v. *Holmes* (1987) 40 Ohio App.3d 361 [532 N.E.2d 170] [no physician/patient relationship between doctor for insurance company and examinee]); Michigan (see *Rogers* v. *Horvath* (1976) 65 Mich.App. 644 [237 N.W.2d 595] [doctor for workers' compensation carrier opined examinee was malingerer; held no claim for malpractice because examinee neither hired doctor nor sought advice or treatment]); and Pennsylvania (see *Ervin* v. *American Guardian Life Assur.* (1988) 376 Pa.Super. 132 [545 A.2d 354] [negligence or malpractice claim requires physician/patient relationship; and employer's doctor who examines prospective employees without giving treatment or advice not liable for erroneous diagnosis]).

Felton seeks to distinguish *Keene*, arguing instead that *Coffee* v. *McDonnell-Douglas Corp.* (1972) 8 Cal.3d 551 [105 Cal.Rptr. 358, 503 P.2d 1366] and *James* v. *United States* (N.D.Cal. 1980) 483 F.Supp. 581 support his claim that a physician hired by the employer is liable for malpractice or negligence where the physician's negligent opinion causes the examinee to suffer solely economic losses. We disagree with both prongs of Felton's argument.

First, *Keene* is not distinguishable in any meaningful sense. In *Keene*, as here, the physician was hired by the employer rather than the examinee, and his role was to provide a report for the benefit of the employer rather than the examinee. In *Keene*, as here, the examinee neither received medical treatment or advice nor relied upon the report for medical treatment or advice.[4] Most importantly, in both *Keene* and this case the physician's sole

---

[4] Felton argues appellants did offer him treatment or advice, because they informed him he would be entitled to reapply if he demonstrated compliance with the antihypertension regimen. Felton argues this fact gives rise to a duty of due care because the *Keene* court specifically noted a duty could have arisen if the physician had volunteered care or treatment or otherwise sought to provide a direct benefit to the examinee. (*Keene* v. *Wiggins, supra,* 69 Cal.App.3d at p. 316, fn. 4.) Even assuming appellants' statements could be characterized as medical treatment or advice, there is no suggestion Felton was *physically harmed* by this allegedly negligent advice. Nothing suggests Felton followed appellants' "advice," much less

function was to provide information to aid the employer's decisionmaking process, not to serve either as an advocate for the employee or an impartial arbiter of a dispute. Under these circumstances we cannot perceive any reason to depart from *Keene.*

Second, a review of *Coffee* and *James* demonstrates these cases are inapposite. Even apart from the distinct defendants considered by *Coffee* and *James*,[5] a fundamental distinction sets those cases apart from the instant case: the nature of the examinee's reliance upon, and the injury suffered as a result of, the misdiagnosis. In *Coffee*, for example, the employee applied for a pilot's position with the employer (an aircraft manufacturer) and was examined to determine whether he was physically fit for that position. The evidence showed the examination was conducted *for the protection of the employee* (as well as the employer and the public), due to the hazards potentially created by the physical stresses on pilots from high altitude flight. (*Coffee* v. *McDonnell-Douglas Corp., supra*, 8 Cal.3d at pp. 553-555.) The examination should have revealed, but because of employer's agent's negligence failed to reveal, the employee suffered from cancer, which condition was not discovered until the employee (on returning from an extended flight) collapsed from exhaustion and was hospitalized. (*Ibid.*) The *Coffee* court concluded, under section 323 of the Restatement Second of Torts,[6] that when an employer voluntarily undertakes to protect the employee from physical harm (i.e., by ascertaining his physical fitness for the job), negligent failure to detect a disability which causes the employee *physical* harm is actionable negligence. (*Coffee* v. *McDonnell-Douglas Corp., supra*, at pp. 557-560.)

Similarly, in *James*, a preemployment physical disclosed the possible existence of cancer, but through negligence the information was neither investigated nor disclosed to the employee. The *James* court, citing *Coffee*, concluded that the employer, having assumed the duty to ascertain the employee's physical fitness, could be liable for the *physical* injuries (i.e., loss of life expectancy) suffered as a proximate cause of its negligent failure to

---

that he was *injured* by following the antihypertension regimen. While a duty of due care may well attach to such advice, there is no suggestion the advice was either negligent or harmful to Felton.

[5] For example, unlike this case (where Felton seeks to impose a duty upon the examining physicians), the courts in both *Coffee* (see 8 Cal.3d at pp. 553-555) and *James* (see 483 F.Supp. at p. 584) examined whether the *employer*, rather than the physician, owed a duty of due care to the examinee.

[6] That section provides in pertinent part:

"One who undertakes . . . to render services to another which he should recognize as necessary for the protection of the other's *person or things*, is subject to liability to the other for *physical harm* resulting from his failure to exercise reasonable care to perform his undertaking, if . . . [¶] (b) the harm is suffered because of the other's reliance upon the undertaking." (Italics added.)

discover or disclose the potential cancer. (*James v. United States, supra*, 483 F.Supp. at pp. 584-587.)

Here, unlike in *Coffee* or *James*, Felton does not claim appellants undertook but negligently failed to discover extant physical problems. To the contrary, Felton argues appellants were negligent for failing to discover Felton was *not* physically impaired. More importantly, unlike in *Coffee* or *James*, there is no claim Felton was *physically* damaged by reliance on the misdiagnosis, which takes this case outside the ambit of section 323 of the Restatement Second of Torts, as well as the cases springing from section 323—*Coffee* and *James*.

Thus, neither *Coffee* nor *James* is relevant to Felton's case. Instead, we remain convinced *Keene* prohibits imposing liability for either negligence or medical malpractice upon a physician hired solely by the employer for the single purpose of providing an opinion on the employee's physical condition—at least when the only "harm" caused an employee by a physician's erroneous report consists of losses resulting from failing to obtain the job.

Our decision to disallow a negligence claim under the facts of this case is buttressed by our recognition that the allowance of a negligence claim under these or similar circumstances would substantially undermine, if not effectively eliminate, the area currently occupied by libel law. Preliminarily, it should be noted Felton was not physically injured from the misdiagnosis, but instead suffered economic harm from the *communication* of the misdiagnosis to the employer. That is, Felton would have suffered no harm but for appellants publishing to Grossmont an injurious falsehood concerning Felton's physical disability, causing him financial harm stemming from the job loss. ██ ██ While publication of an injurious falsehood causing special damages may be actionable as libel or slander (see generally, Civ. Code, §§ 45, 46; *Polygram Records Inc.* v. *Superior Court* (1985) 170 Cal.App.3d 543, 548-550 [216 Cal.Rptr. 252]), such publications may also be protected by defenses not ordinarily assertable in typical negligence or medical malpractice actions, such as the legislatively prescribed privilege contained in Civil Code section 47, subdivision (c) (formerly § 47, subd. (3)).[7]

---

[7]The complaint on its face suggests appellants' publication was protected by the qualified privilege under Civil Code section 47, subdivision (c), because the complaint alleges the false statement about Felton (i.e., he was "medically unsuited [and] not employable [due to] NONCOMPLIANCE WITH ANTIHYPERTENSIVE TREATMENT") was contained in a report from appellants to Grossmont. Such communications are as a general rule qualifiedly privileged. (See, e.g., *Freeman* v. *Mills* (1950) 97 Cal.App.2d 161 [217 P.2d 687] [communication by investigating agency to contracting employer concerning potential employee's fitness for job subject to qualified privilege].) Where the privileged nature of the communication appears on the face of the complaint, as here, the burden is on the plaintiff to plead and prove facts

■ If plaintiffs such as Felton were permitted to sue in negligence, we perceive plaintiffs would seek to evade the strictures of libel law and avoid the applicable defenses by framing all libel actions as negligence causes of action, merely by pleading the defendant was negligent (i.e., in believing the defamatory information to be true). Other courts have rejected analogous attempts to avoid the strictures and defenses of libel law merely by artful pleading. (See *Flynn* v. *Higham* (1983) 149 Cal.App.3d 677, 681-683 [197 Cal.Rptr. 145] [where gravamen of claim is defamatory publication, cannot avoid libel law through pleading claim for infliction of emotional distress]; *Grimes* v. *Carter* (1966) 241 Cal.App.2d 694 [50 Cal.Rptr. 808, 19 A.L.R.3d 1310] [cannot evade statutory bond merely by labeling claim as intentional infliction of emotional distress where gravamen of claim is libel]; *Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 579 [131 Cal.Rptr. 592] [cannot avoid Civ. Code, § 47, subd. (b) (formerly § 47, subd. (2)) privilege merely by relabeling libel claim as intentional infliction of emotional distress claim].) We likewise decline, by not recognizing a negligence duty under these facts, to provide a route by which plaintiffs such as Felton could bypass the law and defenses applicable to libel claims.

DISPOSITION

The judgment is reversed.

Huffman, Acting P. J., and Nares, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 1, 1991. Mosk, J., Broussard, J., and Arabian, J., were of the opinion that the petition should be granted.

---

which overcome the privilege. (*Id.* at p. 167.) The pleading does not allege, nor does the record contain evidence of, facts demonstrating a basis for forfeiting the qualified privilege. However, these issues may not be decided at this juncture, but instead must await resolution during subsequent proceedings should Felton seek to amend his pleadings on remand. (See *Bank of America* v. *Superior Court* (1942) 20 Cal.2d 697, 702-703 [128 P.2d 357].)