# United States Court of Appeals
## For the First Circuit

No. 12-2388

MARK E. SCHAEFER,

Plaintiff, Appellant,

v.

INDYMAC MORTGAGE SERVICES,
ONE WEST BANK, FSB,
FEDERAL NATIONAL MORTGAGE ASSOCIATION,
and HARMON LAW OFFICES, P.C.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

---

Before

Torruella, Dyk,[*] and Kayatta,
Circuit Judges.

---

Walter L. Maroney for appellant.
Thomas R. Lavallee, with whom Harmon Law Offices, P.C., was on brief, for appellees.

---

October 2, 2013

---

[*]Of the Federal Circuit, sitting by designation.

**DYK, Circuit Judge.** Plaintiff Mark E. Schaefer appeals from the decision of the United States District Court for the District of New Hampshire dismissing his suit against defendants IndyMac Mortgage Services; OneWest Bank, FSB; the Federal National Mortgage Association ("Fannie Mae"); and Harmon Law Offices, P.C. ("Harmon"). Schaefer's complaint sought an injunction barring his impending eviction; an order nullifying the March 2012 foreclosure sale of his home and requiring the defendants to allow him to modify or reinstate his mortgage; and monetary damages.

The district court found that Schaefer's claims were barred by the economic loss doctrine, and dismissed his complaint for failure to state a claim. See Schaefer v. IndyMac Mortg. Servs., No. 12-cv-159, 2012 WL 4929094, at *3-*6 (D.N.H. Oct. 16, 2012), reconsideration denied, 2012 WL 6113973 (D.N.H. Dec. 10, 2012). We affirm.

## I.

### A.

The following facts, which are alleged in Schaefer's complaint, are accepted as true for purposes of the motion to dismiss. See Mass. Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 231, 237 (1st Cir. 2013).

In November 2007, Schaefer refinanced his home mortgage, and entered into a refinancing loan and mortgage agreement with IndyMac Bank, FSB. Under the terms of the loan and mortgage agreement,

-2-

Schaefer was required to make regular monthly payments, and IndyMac Bank was allowed to accelerate the principal and to foreclose on the mortgage in the event that Schaefer fell behind on his payments.[1] The mortgage agreement also gave Schaefer the right to reinstate the mortgage before foreclosure upon payment of past due amounts, penalties, interest, and fees. In this litigation, Schaefer alleges that IndyMac or its successors subsequently undertook two additional duties beyond the scope of the contract that restricted their right to foreclose: (1) a duty to provide him with a reinstatement amount in the event that he fell into arrears, and (2) a duty to process an application for loan modification before foreclosure.

At some time after November 2007, IndyMac Bank assigned the mortgage to its corporate parent, OneWest Bank. The mortgage was serviced by IndyMac Mortgage Services, which, like IndyMac Bank, is now a subsidiary of OneWest Bank. We refer to all three entities—IndyMac Bank, IndyMac Mortgage Services, and OneWest Bank—as "OneWest."

---

[1]  The mortgage document was not attached to the complaint but was submitted to the district court by the appellees. While documents not attached to the complaint are ordinarily excluded from consideration on a motion to dismiss, see Fed. R. Civ. P. 12(d), they may be consulted if "the[ir] authenticity . . . [is] not disputed by the parties," they are "central to [the] plaintiff['s] claim," or they are "sufficiently referred to in the complaint," Watterson v. Page, 987 F.2d 1, 3-4 (citing cases). See generally 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004). The mortgage document falls into this category.

Schaefer defaulted on the loan in 2009, after which OneWest agreed to modify the loan.

In late 2011, Schaefer again fell behind on his mortgage payments. On January 19, 2012, Schaefer received a letter from OneWest ("the January 19 letter") informing him that his loan account was "6 [p]ayments [p]ast [d]ue." See Schaefer Br. addendum 27. The letter specified a "[t]otal [a]mount [d]ue" of $12,519.25, and indicated that after February 16, a "[f]ee [a]ssessment" would be added, bringing the total to $12,572.46. Id. The letter did not refer to either amount as a "reinstatement amount," and did not include specific line items for "further accruing interest, costs, attorney's fees," or other items that Schaefer alleges are "typically included as additions to an arrearage to establish an actual reinstatement amount." Id. at 6-7. Around the same time, Schaefer downloaded from OneWest's website a "comprehensive mortgage modification application." Id. at 6.

On January 30, Schaefer received a letter from Harmon, counsel to OneWest, informing him that Harmon had been "instructed to bring a foreclosure" because Schaefer was "in breach of the conditions of the loan documents." See id. at 21. This letter stated that the loan was "hereby accelerated," with "the entire balance" of $246,992.57 "due and payable forthwith and without further notice." Id. The letter also informed Schaefer that "[e]ven though the note has been accelerated, [he] may still have the right to reinstate

-4-

the loan." Id.  The letter did not include a reinstatement amount, but directed Schaefer to the firm's website or telephone number in order "to request a reinstatement [amount]."  Id.

Schaefer requested a reinstatement amount from Harmon's website on February 6 and again on February 16.  On each occasion, he received the following (seemingly automated) notice:

> Your request has been received.  We will forward the reinstatement . . . information to you when it is obtained from your lender or servicer or the lender or servicer will send this information to you directly.
>
> . . . .
>
> Unless there is an imminent sale, please wait 5 business days before following up with us on reinstatements . . . .  You may follow up by contacting us at . . . .
>
> We will get back to you within 24 hours with a status of your pending request.

Id. at 24, 25.  Schaefer alleges that neither Harmon nor OneWest ever contacted him with a reinstatement amount; Schaefer did not attempt to follow up on his requests for a reinstatement amount by contacting OneWest.

On February 14, Schaefer received a foreclosure notice from Harmon, informing him that a foreclosure sale would occur on March 12.[2]

---

[2]     The notice identified Fannie Mae as the "present holder of [the m]ortgage."  Id. at 28.  According to documents filed by the defendants before the district court, Fannie Mae received the mortgage by assignment from OneWest on January 26, 2012, while retaining OneWest as the mortgage servicer.  The identity of the mortgage holder is not at issue in this appeal.  See Schaefer, 2012 WL 4929094, at *3 n.4.

Two days later, Schaefer faxed OneWest a completed application for a loan modification. He telephoned OneWest three days thereafter, and was told by a OneWest representative to resend part of his application, which he promptly did.

On February 23, a OneWest representative contacted Schaefer and asked for additional information regarding Schaefer's partner, Kathryn Russell, whom Schaefer had listed as a future contributor to his mortgage payments. Schaefer was instructed to fax Russell's financial information to (866) 235-2366 ("the '235 fax number").

At about the same time that the OneWest representative instructed Schaefer to send Russell's information to the '235 fax number, Schaefer received a letter from a "customer contact manager" at OneWest named Elizabeth Milian ("the Milian letter"). Id. at 32. The Milian letter stated that Milian and her "team," which included "loan modification underwriters," would "be [Schaefer's] point of contact throughout this process," and that "either [Milian], or a representative from [her] team, [would] be available to answer any questions [he] may have while [his] loan [was] being reviewed." Id. The letter provided Milian's contact information, including a fax number: (866) 435-7643 ("the '435 fax number"). Id. The letter closed by expressing Milian's intent to "provide timely and accurate communication between [Schaefer] and [OneWest]," and by indicating that once he had submitted a "completed application," Milian's team would "initiate the review

-6-

of [his] loan." Id.

On February 28, Schaefer faxed Russell's financial information to OneWest. Acting in reliance on the Milian letter, he sent the information to the '435 fax number, rather than to the '235 fax number previously provided by the OneWest representative. Several days later, Schaefer received a telephone call from a representative inquiring about the submission of the financial information. Schaefer explained that he had faxed the materials to the '435 number, and was told by the representative to disregard the Milian letter and resend the materials to the '235 number. He did so on March 9. Schaefer heard nothing further from OneWest.

The foreclosure sale took place, as scheduled, on March 12. On March 15, Fannie Mae notified Schaefer that it had purchased his house at the foreclosure sale,[3] and eleven days later Harmon served him with an eviction notice.

**B.**

In early April 2012, Schaefer filed suit against OneWest, Fannie Mae (the current mortgage holder), and Harmon (OneWest's counsel) in New Hampshire state court. In his verified complaint, Schaefer alleged the facts recited above, and asserted two causes of action: negligence, arising from the defendants' failure to provide him a reinstatement amount and alleged mishandling of his

---

[3] While Schaefer's complaint states that this notification took place on February 15, that appears to be an error. It is undisputed that the notification took place on March 15, as reflected in the exhibits to the complaint.

-7-

modification application, and negligent misrepresentation, arising from the allegedly misleading Milian letter.[4] As relief, Schaefer sought an injunction against the pending eviction, an order nullifying the foreclosure sale and requiring the defendants to allow him to modify or reinstate his mortgage, and compensatory damages for "the loss of his home of 28 years and any and all equity therein." Id. at 11-13, 18. In other words, Schaefer's central claim was that OneWest and Fannie Mae could not exercise their right to foreclose under the mortgage contract.

The defendants removed the case to the United States District Court for the District of New Hampshire on the basis of diversity of citizenship. See 28 U.S.C. §§ 1332, 1441. The defendants filed motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing both that Schaefer's tort claims were barred by the economic loss doctrine and that the claims failed because the defendants had not breached any duties owed to Schaefer.

The district court granted the defendants' motions to dismiss. The court first rejected Schaefer's argument that the economic loss

---

[4] Schaefer also asserted a claim for intentional misrepresentation, arising from the same facts as the negligent misrepresentation claim, and a claim for breach of the contractual duty of good faith and fair dealing, arising from the defendants' failure to delay the foreclosure while reviewing his request for modification. Neither of these claims is presented on appeal. Schaefer has abandoned his contract claim, and he offers no developed argumentation with respect to his intentional misrepresentation claim, which we deem to be abandoned. See, e.g., In re Redondo Constr. Corp., 678 F.3d 115, 126 n.7 (1st Cir. 2012).

doctrine does not apply to claims seeking injunctive relief, holding that because the harm alleged in the complaint "is economic," consisting of "the loss of his property and the equity he held in the property," the doctrine applies without regard to the form of relief sought. Schaefer, 2012 WL 4929094, at *3 & n.5. The court went on to find that none of the tort claims fell within any exception to the economic loss doctrine recognized by the New Hampshire courts. Id. at *4-5. The court dismissed the negligence claim, holding that "Schaefer [had not] alleged facts or developed an argument sufficient to establish that OneWest assumed duties based on Harmon's [January 30] letter or the Milian Letter." Id. at *4. Regarding the negligent misrepresentation claim, the court concluded that the subject matter of the Milian letter "relate[d] entirely to [the] defendants' attempts to collect [Schaefer's] mortgage debt," and that any claim related to that letter was therefore "barred by the economic loss doctrine." Id. at *4-*5 (second and third alterations in original, quotation marks omitted).

Schaefer appealed. We have jurisdiction under 28 U.S.C. § 1291. We review de novo an order dismissing a claim under Rule 12(b)(6). See Mass. Ret. Sys., 716 F.3d at 237.

## II.

The economic loss doctrine is a common-law doctrine according to which parties bound by a contract may not "'pursu[e] tort

-9-

recovery for purely economic or commercial losses associated with the contract relationship.'" See Plourde Sand & Gravel Co. v. JGI E., Inc., 917 A.2d 1250, 1253 (N.H. 2007) (quoting Tietsworth v. Harley-Davidson, Inc., 677 N.W.2d 233, 241 (Wis. 2004), further proceedings at 735 N.W.2d 418 (Wis. 2007)).  The purpose of the doctrine is "to prevent tort law's unreasonable interference with principles of contract law." See id. at 1254.

In its broadest form, the doctrine reaches beyond the contractual context, and provides that "a plaintiff may not . . . recover in a negligence claim for purely 'economic loss.'" See id. at 1253-54 (quoting Border Brook Terrace Condo. Ass'n v. Gladstone, 622 A.2d 1248, 1253 (N.H. 1993)); see also Kelleher v. Marvin Lumber & Cedar Co., 891 A.2d 477, 495 (N.H. 2005) ("We have . . . recognized that a plaintiff may not ordinarily recover damages for purely economic loss in tort . . . .").  In other words, the doctrine holds that, in the absence of a specific duty, no general duty exists to avoid negligently causing economic loss.  This version of the doctrine has been adopted in New Hampshire.  As the New Hampshire Supreme Court has stated, "[i]n New Hampshire, the general rule is that persons must refrain from causing personal injury and property damage to third parties, but no corresponding tort duty exists with respect to economic loss." See Plourde, 917 A.2d at 1254 (quotation marks omitted).  However, this broad

-10-

doctrine has exceptions.[5]

The gravamen of Schaefer's argument is that "New Hampshire law
. . . recognizes an exception to the economic loss doctrine for
[voluntarily] assumed duties extrinsic to the central issues of a
contract," and that the defendants assumed such a gratuitous,
extra-contractual duty to provide him a reinstatement amount and
consider his application to modify the mortgage following his
default. See Schaefer Br. 18-21.

The New Hampshire Supreme Court has long followed the guidance
of the Restatement of Torts concerning issues of tort law
generally.[6] The Second Restatement of Torts does not discuss the

---

[5] One such exception, recognized in New Hampshire and
discussed below, applies to certain claims for negligent
misrepresentation. See id. at 1254, 1257-58; Wyle v. Lees, 33 A.3d
1187, 1191-92 (N.H. 2011). Another exception applies to
malpractice-like claims based on the breach of extra-contractual
duties arising from the qualifications of licensed professionals.
See Congregation of the Passion v. Touche Ross & Co., 636 N.E.2d
503, 514-15 (Ill. 1994); Farmers Alliance Mut. Ins. Co. v. Naylor,
452 F. Supp. 2d 1167, 1174 (D.N.M. 2006); see also Mehigan v.
Sheehan, 51 A.2d 632 (N.H. 1947) (discussing the relationship
between malpractice and contract law, in a case involving
non-economic losses). New Hampshire also recognizes an exception
for negligence claims brought against defendants who bear a
"special relationship" to the plaintiff, such as the relationship
between an attorney drafting a will and the intended beneficiary of
that will. See Plourde, 917 A.2d at 1254-55. No such special
relationship was alleged to exist in this case.

[6] See, e.g., Remsburg v. Docusearch, Inc., 816 A.2d 1001,
1009 (N.H. 2003) (adopting Restatement (Second) of Torts § 652C
(1977)); Valenti v. NET Props. Mgmt., 710 A.2d 399, 401 (N.H. 1998)
(adopting Restatement (Second) § 425); Long v. Long, 611 A.2d 620,
623 (N.H. 1992) (adopting Restatement (Second) § 682); Spherex,
Inc. v. Alexander Grant & Co., 451 A.2d 1308, 1312 (N.H. 1982)
(adopting Restatement (Second) § 552); Buttrick v. Arthur Lessard
& Sons, Inc., 260 A.2d 111, 113-14 (N.H. 1969) (adopting
Restatement (Second) of Torts § 402A (1965)).

-11-

question of a defendant's liability for economic loss resulting from the breach of an assumed duty, but does recognize that under certain circumstances, "[o]ne who undertakes, gratuitously . . . , to render services to another . . . is subject to liability . . . for physical harm resulting from his failure to exercise reasonable care to perform his undertaking."  See Restatement (Second) of Torts § 323 (1965) (emphasis added); see also id. § 324A (addressing third-party harm in similar terms).  The New Hampshire Supreme Court follows this rule in physical-injury cases.[7]

While the Restatement does not explicitly address whether economic losses, as opposed to losses resulting from physical injury, are recoverable for the breach of a voluntarily assumed duty, courts in a large number of jurisdictions have read the references to "physical harm" in § 323 and § 324A of the Restatement as affirmatively precluding recovery for economic losses in such cases.[8]  A smaller number of courts, by contrast,

_____

[7]    See, e.g., Trull v. Town of Conway, 669 A.2d 807, 810 (N.H. 1995); Walls v. Oxford Mgmt. Co., 633 A.2d 103, 105 (N.H. 1993); Corson v. Liberty Mut. Ins. Co., 265 A.2d 315, 318-19 (N.H. 1970); Tullgren v. Amoskeag Mfg. Co., 133 A. 4, 5-6 (N.H. 1926); see also § 323 illus. 1 & reporter's notes (citing Tullgren as illustrating the Restatement's rule).

[8]    See, e.g., Shaner v. United States, 976 F.2d 990, 994 (6th Cir. 1992); Love v. United States, 915 F.2d 1242, 1248 (9th Cir. 1989); Fieldwork Bos., Inc. v. United States, 344 F. Supp. 2d 257, 264 (D. Mass. 2004); Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc., 79 F. Supp. 2d 1219, 1228 (W.D. Wash. 1999); Or. Laborers-Emp'rs Health & Welfare Trust Fund v. Philip Morris, Inc., 17 F. Supp. 2d 1170, 1182-1183 (D. Or. 1998); Felton v. Schaeffer, 229 Cal. App. 3d 229, 237-38 (1991); Rojas Concrete, Inc. v. Flood Testing Labs., Inc., 941 N.E.2d 940, 946-47 (Ill. App. Ct. 2010); Theisen v. Covenant Med. Ctr., 636 N.W.2d 74, 82-83

have held that § 323 and § 324A do not limit liability for the breach of an assumed duty, and that economic losses are recoverable in such cases as well, at least under some circumstances.[9]

The law in New Hampshire is not entirely clear on this question. In one case predating the adoption of the current Restatement of Torts, Brunelle v. Nashua Building and Loan Association, 64 A.2d 315 (N.H. 1949), the New Hampshire Supreme Court held that the defendant, a seller of real estate, could be held liable in tort for breaching its agent's "separate oral undertaking" to "see to it that [the plaintiffs] received a good title," even though the defendant's contractual obligations did not extend so far. Id. at 317 (syllabus); see also id. at 318 (opinion). More recently, in Seymour v. New Hampshire Savings Bank, 561 A.2d 1053 (N.H. 1989), the court referred to "the prevailing rule" according to which "no [tort] duty is imposed upon a lender . . . to exercise reasonable care in its inspection of the

_____

(Iowa 2001); Long v. Niles Co., 2010 Mass. App. Div. 43, 46 n.5 (Mass. Dist. Ct. App. Div. 2010); Northfield Ins. Co. v. St. Paul Surplus Lines Ins. Co., 545 N.W.2d 57, 62-63 (Minn. Ct. App. 1996); Carlotti v. Emps. of GE Fed. Credit Union No. 1161, 717 A.2d 564, 566-67 (Pa. Super. Ct. 1998) (citing conflicting authority); King v. Graham Holding Co., 762 S.W.2d 296, 299-300 (Tex. App. 1988); Hatleberg v. Norwest Bank Wis., 700 N.W.2d 15, 23-24 (Wis. 2005).

[9] See, e.g., Rudolph v. First S. Fed. Sav. & Loan Ass'n, 414 So. 2d 64, 71 (Ala. 1982); Lloyd v. State Farm Mut. Auto. Ins. Co., 860 P.2d 1300, 1303 (Ariz. Ct. App. 1992); City & Cnty. of S.F. v. Philip Morris, Inc., 957 F. Supp. 1130, 1143-44 (N.D. Cal. 1997); Blackmon v. Nelson, Hesse, Cyril, Weber & Sparrow, 419 So. 2d 405, 406 (Fla. Dist. Ct. App. 1982) (per curiam); Runde v. Vigus Realty, Inc., 617 N.E.2d 572, 575 (Ind. Ct. App. 1993); Schwartz v. Greenfield, Stein & Weisinger, 396 N.Y.S.2d 582, 584-85 (N.Y. Sup. Ct. 1977).

borrower's premises . . . <u>unless the lender voluntarily undertakes to perform such inspection . . . for the benefit of the borrower</u>," <u>see</u> <u>id.</u> at 1056-57 (emphasis added, quotation marks omitted), thus perhaps suggesting that a defendant may be held liable for economic losses resulting from the failure to conduct such inspections if the defendant had in fact voluntarily assumed a duty to conduct them.

Even if we were to assume that the holding in <u>Brunelle</u> and the dictum in <u>Seymour</u> place New Hampshire in the camp of states that extend § 323 and § 324A to economic losses resulting from the breach of an assumed duty in some circumstances, we would still conclude that Schaefer has not stated a negligence claim on which relief may be granted.

The parties appear to agree on what is apparent from the face of the mortgage agreement—that Schaefer was obligated to make regular monthly payments and that, if he failed to do so, OneWest and Fannie Mae had a right to accelerate the loan and foreclose on the mortgage. The parties also agree that Schaefer did not make the required payments. The mortgage agreement provided as well that in the event of Schaefer's default OneWest would discontinue foreclosure proceedings and reinstate the mortgage if Schaefer paid his arrears plus any expenses incurred by OneWest within a prescribed period of time. Schaefer alleges that the defendants additionally undertook two duties: (1) to provide him with a

reinstatement amount if Schaefer fell into arrears and (2) if Schaefer applied to modify his mortgage, to process his application before foreclosure. Schaefer alleges that the defendants failed to perform or negligently performed these undertakings and are therefore subject to tort liability.

We conclude that New Hampshire's economic loss doctrine bars Schaefer from recovering in tort for a breach of either of these alleged undertakings. With respect to the alleged duty to provide a reinstatement amount, it is true that OneWest's agreement to allow reinstatement necessarily included a promise to provide Schaefer with a reinstatement amount upon request. But if OneWest assumed a <u>contractual</u> duty to provide a reinstatement amount, Schaefer's tort claims here must fail because the essence of the economic loss doctrine is that a party to a contract may not "'pursu[e] tort recovery for purely economic or commercial losses associated with the contract relationship.'" <u>Plourde</u>, 917 A.2d at 1253 (internal quotation marks omitted). <u>See also</u> <u>Tietsworth</u>, 677 N.W.2d at 241 ("The doctrine generally requires transacting parties . . . to pursue only their contractual remedies when asserting an economic loss claim.") (internal quotation marks omitted). Although Schaefer claimed in the breach of contract count of his complaint that he "was denied critical information in the form of a reinstatement quote, thereby denying [him] any realistic opportunity to reinstate his loan," Schaefer Br. addendum 12, as

-15-

explained previously, Schaefer has abandoned his breach of contract claim on appeal, <u>see</u> <u>supra</u> n.4.

Nor can Schaefer recover in tort for the breach of an alleged duty that contradicts the terms of the contract. The mortgage agreement specifically granted OneWest the right to accelerate payments and foreclose in the event that Schaefer fell into default and failed to reinstate. It is clear, then, that the second duty Schaefer alleges the defendants assumed—the duty to process his mortgage modification application before foreclosure—is not merely an <u>additional</u> duty, coming on top of the obligations the defendants assumed under the contract, but rather a duty that contradicts the terms of the contract by restricting the defendants' right to foreclose. So far as we are able to discern, none of the cases, from New Hampshire or elsewhere, has enforced in tort a duty of this kind, which contradicts the terms of a contract.[10]

_____

[10] In <u>Brunelle</u>, for example, the duty assumed gratuitously by the defendant to ensure the plaintiffs "would receive a clear title" came on top of the duties spelled out in the land sale contract. <u>See</u> <u>Brunelle</u>, 64 A.2d at 317. <u>See also, e.g.</u>, <u>Rudolph</u>, 414 So. 2d at 71 (holding that a construction lender may voluntarily assume a duty "to inspect the [construction project] for the [borrower's] benefit," in addition to the lender's "independent [contractual] right [to] inspect[ the project] for its [own] exclusive benefit"); <u>Runde</u>, 617 N.E.2d at 573, 575-76 (holding that a home inspector and a real estate broker may have assumed a duty to the buyer to notify the seller on the buyer's behalf of property defects found in the course of the inspection, even though the defendants' service contracts were apparently silent as to any such duty to notify); <u>Lloyd</u>, 860 P.2d at 1303-04 (holding that an insurance company may have assumed a duty to defend a customer against a tort claim falling outside the scope of the customer's insurance contract where a "claims person . . . told [the customer] over the telephone that [the insurer] would 'take

In New Hampshire, "[p]arties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably." See Mills v. Nashua Fed. Sav. & Loan Ass'n, 433 A.2d 1312, 1315 (N.H. 1981). In general, the terms of a contract cannot be modified by a later agreement in the absence of consideration. See Kendall v. Flanders, 54 A. 285, 285 (N.H. 1903) ("If [a subsequent agreement was] offered for the purpose of modifying the contract evidenced by the note in suit, to have been admissible it must have been supported by a consideration."). If we were to recognize a duty, enforceable in tort, to modify Schaefer's mortgage after Schaefer had defaulted on his performance under the contract, we would not merely be imposing an additional duty on the defendants, but would instead be altering the rights and duties specifically addressed in the mortgage contract. This would allow tort law to "unreasonabl[y] interfere[] with principles of contract law"—the precise outcome that the economic loss

care of it' and [the insurer] shortly thereafter hir[ed a lawyer] to represent the [customer]"); Blackmon, 419 So. 2d at 405-06 (holding that by assisting its employees in obtaining group health insurance, an employer assumed an extra-contractual duty to make accurate representations to an employee about her insurance coverage); McDonald, 621 P.2d at 656-59 (holding that an escrow agent and title insurer may have voluntarily assumed a duty to "advis[e the buyers] on the[ir potential] legal liability for . . . subcontractors' liens" on the property, in addition to the defendant's ordinary contractual and professional duties as an escrow agent and title insurer).

-17-

doctrine seeks to avoid. See Plourde, 917 A.2d at 1254; see also id. at 1256 ("'[Where] the defendant and its partner have allocated the risks and benefits of performance in their contract, . . . the court upsets that allocation when it imposes [tort] liability on the defendant.'" (alterations in original) (quoting Jay M. Feinman, The Economic Loss Rule and Private Ordering, 48 Ariz. L. Rev. 813, 814 (2006)).[11] For this reason, the district court correctly held that the economic loss doctrine bars Schaefer's negligence claim.

Schaefer also claims that "New Hampshire law provides mortgagees who have fallen behind on their mortgages with a statutory opportunity to reinstate the mortgage prior to foreclosure," citing § 479:18 of the New Hampshire code. Schaefer Br. 20. We have not found any authority from New Hampshire recognizing a statutory or common-law (as distinct from contractual) right to reinstate a mortgage, however.[12]

_____

[11] Although Harmon was not in a contractual relationship with Schaefer, Schaefer's negligence claims against Harmon arise from duties that Harmon allegedly "assumed as an agent of" OneWest and Fannie Mae. See Schaefer Br. 21. As such, any liability imposed on Harmon, as the other defendants' agent, would effectively modify the terms of the other defendants' contract with Schaefer. While Schaefer contends in his brief that Harmon owed him duties independently arising from its status as a debt collector, we decline to address that contention because he fails to present any developed argument on the issue. See In re Redondo, 678 F.3d at 126 n.7.

[12] Section 479:18 merely provides that "[a]ll lands conveyed in mortgage may be redeemed by the mortgagor . . . by the payment of all demands and the performance of all things secured by the mortgage and the payment of all damages and costs sustained and incurred by reason of the nonperformance of its condition . . . before foreclosure." N.H. Rev. Stat. Ann. § 479:18 (emphasis added). The right secured by the statute to redeem a mortgage by

Schaefer also appeals the district court's dismissal of his claim for negligent misrepresentation, which focuses on the Milian letter's alleged misrepresentations regarding Milian's availability to assist with his claim and its suggestion that Schaefer use the '435 fax number to communicate with OneWest. There is no question that New Hampshire recognizes an exception to the economic loss doctrine for certain negligent misrepresentation claims. See Wyle v. Lees, 33 A.3d 1187, 1190-93 (N.H. 2011); Plourde, 917 A.2d at 1257-58. Schaefer's claim, however, falls outside the scope of this exception.

As an initial matter, there is language in Plourde to suggest that the negligent misrepresentation exception is limited to defendants "who [are] in the business of supplying information."

---

paying off the outstanding debt in its entirety is distinct from the right, invoked by Schaefer, to reinstate the mortgage by paying only the delinquent portion of the debt. See Black's Law Dictionary 1548 (9th ed. 2009) (defining "statutory right of redemption" as the right "of a mortgagor in default to recover property after a foreclosure sale by paying the principal, interest, and other costs that are owed, together with any other measure required to cure the default"); id. at 1399 (defining "reinstatement" as "place[ment] again in a former state or position"); see also 17-4 New Hampshire Practice: Real Estate § 4.05 (Matthew Bender & Co. 2013) ("[A] mortgagor has a statutory right to ownership free of the mortgage after meeting the loan and mortgage obligations." (citing § 479:18)); Fed. Home Loan Mort. Corp., Learning Center Glossary, http://www.freddiemac.com/learn/lo/glossary/ (last visited Aug. 13, 2013) (defining the "redemption period" as "[t]he time . . . during which a borrower may reclaim foreclosed property by paying the full amount of the foreclosure sales price," and "reinstatement, full" as the process of "restor[ing] a delinquent mortgage to active status by paying . . . the total amount delinquent" (emphases added)).

See Plourde, 917 A.2d at 1254.  Schaefer does not claim that any of the defendants fall into this category, which includes professionals such as "accountants, appraisers, . . . and investment brokers.  See Pitts v. Farm Bureau Life Ins. Co., 818 N.W.2d 91, 112 (Iowa 2012).  But at the same time, the court in Plourde relied for its formulation of the exception on § 552 of the Second Restatement of Torts, which imposes liability for negligent misrepresentation more broadly on defendants who supply false information "'in the course of [their] business, profession or employment, or in any other transaction in which [they have] a pecuniary interest, . . . for the guidance of others in their business transactions.'"  See id. at 1257 (quoting Restatement (Second) of Torts § 552 (1977)).  In Wyle, decided after Plourde, the court applied the negligent misrepresentation exception to defendants who were not professional suppliers of information, but rather homeowners who made representations regarding their property prior to its sale.  See Wyle, 33 A.3d at 1189-92.

Courts in other states are divided over whether § 552 is limited to professional suppliers of information, or applies more broadly to parties who "profit by supplying the information." Compare, e.g., Pitts, 818 N.W.2d at 111-12 ("[O]nly those who are in the business of supplying information to others can be liable for negligent misrepresentation." (quotation marks omitted)) with State ex rel. Bronster v. U.S. Steel Corp., 919 P.2d 294, 307-12

-20-

(Haw. 1996) (holding that § 552 does not require that defendants "be in the business of supplying information," but only that "[t]hey . . . profit by supplying the information").

But the New Hampshire Supreme Court in <u>Wyle</u> made clear that the scope of liability against those who are not professional suppliers of information is limited. In <u>Wyle</u>, a property seller misrepresented, both in a property disclosure statement included in the property listing and in a conversation with the buyer "prior to [the] purchase," that the seller had all the necessary permits for improvements made to the property. See <u>Wyle</u>, 33 A.3d at 1190; <u>see also</u> Restatement (Second) of Torts § 552 cmt. h, illus. 4 (describing a similar scenario involving a misrepresentation in a real estate listing). The court "distinguished those negligent misrepresentation claims that center upon an alleged inducement to enter into a contract from those that focus upon performance of the contract." See <u>Wyle</u>, 33 A.3d at 1191. The court held that the former class of misrepresentations (which by definition must predate the formation of the contract), but not the latter class, may form the basis of a negligent misrepresentation claim, at least where the defendant is not a professional supplier of information. <u>Id.</u> at 1191-92.

Schaefer argues that <u>Wyle</u> does not bar his claims. We are unpersuaded. We read <u>Wyle</u> as holding that the negligent misrepresentation exception reaches only those representations that

precede the formation of the contract or that relate to a transaction other than the one that constitutes the subject of the contract; representations made during the course of the contract's performance and related to the subject matter of the contract, by contrast, are so bound up in "the performance of the contract" as to be barred by the economic loss doctrine. See id. at 1191-92. Here, the representations were made during the course of the contract's performance, and related to the subject matter of the contract. Specifically, they concerned the process by which the lenders would decide whether or not to exercise their contractual right to foreclose on the mortgage; boiled down to its essentials, Schaefer's complaint alleges that the lenders misrepresented the circumstances under which they would agree to forego that contractual right. Such a claim, in Wyle's terms, "focus[es] upon performance of the contract," id. at 1191, and is barred by the economic loss doctrine. Therefore, the district court correctly dismissed Schaefer's negligent misrepresentation claim.

### III.

We therefore affirm the decision of the district court dismissing Schaefer's negligence and negligent misrepresentation claims.

### AFFIRMED

Costs to appellees.